1   BOIES SCHILLER FLEXNER LLP
    Richard J. Pocker (NV Bar No. 3568)
2   300 South Fourth Street, Suite 800
    Las Vegas, NV 89101
3   (702) 382-7300
    rpocker@bsfllp.com
4
    BOIES SCHILLER FLEXNER LLP
5   Sigrid S. McCalwey
    401 E. Las Olas Blvd., Suite 1200
6   Ft. Lauderdale, FL 33301
    (954) 356- 0011
7   smccawley@bsfllp.com

8   MANATT, PHELPS & PHILLIPS LLP
    Esra A. Hudson (*pro hac vice* forthcoming)
9   Stephanie A. Roeser (*pro hac vice*
    forthcoming)
10  2049 Century Park East, Suite 1700
    Los Angeles, California 90067
11  (310) 312-4000
    ehudson@manatt.com
12  sroeser@manatt.com
13
    Matthew F. Bruno
14  7 Times Square
    New York, NY 10036
15  (212) 790-4525
    mbruno@manatt.com
16

17

18  *Attorneys for Respondent Blake Lively*

19

        WILLKIE FARR & GALLAGHER LLP
        Michael J. Gottlieb (*pro hac vice* forthcoming)
        Kristin E. Bender
        1875 K Street NW
        Washington, DC 20006
        (202) 303-1000
        mgottlieb@willkie.com
        kbender@willkie.com

        Aaron E. Nathan
        787 Seventh Avenue
        New York, NY 10019
        (212) 728-8904
        anathan@willkie.com

        DUNN ISAACSON RHEE LLP
        Meryl C. Governski (*pro hac vice*
        forthcoming)
        401 Ninth Street, NW
        Washington, DC 20004
        (202) 240-2900
        mgovernski@dirllp.com

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA

20

21

22  **In Re Subpoena to:**

23  **MARIO LAVANDEIRA JR.**
    **aka PEREZ HILTON**

24

25

26

27

28

        Case No. 2:25-CV-01396-RFB-DJA

        **OPPOSITION TO THIRD-PARTY
        PEREZ HILTON'S MOTION TO
        QUASH AND CROSS MOTION TO
        COMPEL**

---

**OPPOSITION TO THIRD-PARTY PEREZ HILTON'S MOTION TO QUASH AND
CROSS MOTION TO COMPEL**

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................1

BACKGROUND ................................................................................................3

    A.    Ms. Lively Filed The Underlying Litigation Asserting Claims of Sexual
Harassment, Retaliation, and Defamation, Among Others. ...................3

    B.    Hilton, Who Identifies Himself As An "Influencer," Has Posted More
Than 540 Disparaging Pieces Of Content About Ms. Lively. ................4

    C.    Ms. Lively Served The Subpoena after Defendant TAG Identified Him As
Having Generated Content On Its Behalf. ............................................7

    D.    Ms. Lively Served The Subpoena And Mr. Hilton Has Sought Relief
Relating To It Both In The Issuing Court And This One. .......................8

LEGAL STANDARD ........................................................................................11

ARGUMENT ...................................................................................................12

I.    THE COURT SHOULD TRANSFER THE MOTION TO THE ISSUING
COURT. ...................................................................................................12

II.    IN THE ALTERNATIVE, THE COURT SHOULD DENY THE MOTION. ...............14

    A.    The Subpoena Does Not Impose Any Undue Burden On Mr. Hilton. ..............14

    B.    The Subpoena Does Not Seek The Disclosure Of Privileged Materials. .............16

        1.    The Subpoena does not seek material covered by the Nevada Shield
Law. .............................................................................................16

                i.    *Mr. Hilton was not acting as a
"professional journalist" when he
generated the materials sought.* ......................................16

                ii.    *If applicable, the Nevada Shield Law should
give way.* ....................................................................19

        2.    The requested documents are not protected by Attorney-Client
Privilege. ......................................................................................20

    C.    The Subpoena Is Procedurally Valid. ...................................................22

    D.    Nevada's Anti-SLAPP Law Does Not Provide A Basis To Quash. ....................22

    E.    Mr. Hilton's Trade Secret Concerns Do Not Provide A Basis To Quash...............23

i

F.    There Is No Basis For The Court To Award Fees Or Enter Sanctions...................23

III.    IF THE COURT DENIES THE MOTION, IT SHOULD COMPEL MR.
HILTON TO RESPOND TO AND PRODUCE MATERIALS RESPONSIVE TO
THE SUBPOENA...........................................................................................................24

OPPOSITION TO THIRD-PARTY PEREZ HILTON'S MOTION TO QUASH AND
CROSS-MOTION TO COMPEL

# TABLE OF AUTHORITIES

**Cases**                                                                        **Page(s)**

*Apple Inc. v. Samsung Elecs. Co.*,
   306 F.R.D. 234 (N.D. Cal. 2015) ............................................................. 21

*Apple v. Csaa Gen. Ins. Co.*,
   No. 219CV01093RFBDJA, 2021 WL 3216465 (D. Nev. July 29, 2021) ......................... 12, 13

*Argento v. Sylvania Lighting Servs. Corp.*,
   No. 2:15-CV-01277-JAD-NJ, 2015 WL 4918065 (D. Nev. Aug. 18, 2015) .............. 12, 13, 22

*Ariix, LLC v. NutriSearch Corp.*,
   985 F.3d 1107 (9th Cir. 2021) ............................................................... 19

*Aspen Fin. Servs., Inc. v. Eighth Jud. Dist. Ct. of State ex rel. Cnty. of Clark*,
   313 P.3d 875 (2013) .......................................................................... 19

*Banq, Inc. v. Purcell*,
   No. 2:22-CV-00733-APG-DJA, 2025 WL 1938754 (D. Nev. July 14, 2025)
   (Albregts, J.) ............................................................................. 15, 23

*Bd. of Trs. of S. Nevada Joint Mgmt. & Culinary & Bartenders Training Fund v. Fava*,
   No. 2:18-cv-00036-JCM-DJA, 2019 WL 11093817 (D. Nev. Oct. 31, 2019)
   (Albregts, J.) ................................................................................. 23

*Cardinali v. Plusfour, Inc.*,
   No. 2:16-cv-02046-JAD-NJK, 2018 WL 7502644 (D. Nev. Oct. 9, 2018) ...................... 14

*Chevron Corp. v. Berlinger*,
   629 F.3d 297 (2d Cir. 2011) ................................................................. 18

*Diaz v. Eighth Jud. Dist. Ct. ex rel. Cnty. of Clark*,
   116 Nev. 88, 993 P.2d 50 (2000) ...................................................... 16, 17, 19

*Finn v. City of Boulder City*,
   No. 2:14-cv-01835-JAD-GWF, 2017 WL 11682320 (D. Nev. Dec. 20, 2017) ................. 19

*In re Fitch, Inc.*,
   330 F.3d 104 (2d Cir. 2003) ................................................................. 18

*GW Grundbesitz AG v. Gunn*,
   No. 2:21-cv-02074-CDS-NJK, 2022 WL 4359131 (D. Nev. Sept. 20, 2022) .................. 23

*Harris v. Cnty. of Orange*,
   682 F.3d 1126 (9th Cir. 2012) ................................................................ 1

OPPOSITION TO THIRD-PARTY PEREZ HILTON'S MOTION TO QUASH AND
CROSS-MOTION TO COMPEL

*Hornor v. Wey*,
  No. 2:22-CV-01840-RFB-DJA, 2025 WL 1617589 (D. Nev. May 8, 2025)
  (Albregts, J.)............................................................................................................11, 17

*Hurst-Castl v. Long Term Cap. P'ship VI, LLC*,
  No. 2:24-CV-02334-GMN-MDC, 2025 WL 1266736 (D. Nev. Apr. 30, 2025).......................1

*Jackson v. Montgomery Ward & Co.*,
  173 F.R.D. 524 (D. Nev. 1997)........................................................................................15

*In re Madden*,
  151 F.3d 125 (3d Cir. 1998).............................................................................................18

*Mount Hope Church v. Bash Back!*,
  705 F.3d 418 (9th Cir. 2012) ....................................................................................23, 24

*Nguyen v. Shelter Mut. Ins. Co.*,
  No. 2:24-CV-00014-CDS-BNW, 2025 WL 343174 (D. Nev. Jan. 29, 2025)........................20

*Obsidian Fin. Group, LLC v. Cox*,
  No. CV–11–57–HZ, 2011 WL 5999334 (D.Or. Nov. 30, 2011)............................................16

*Patin v. Ton Vinh Lee*,
  429 P.3d 1248 (2018).......................................................................................................22

*Paws Up Ranch, LLC v. Green*,
  No. 2:12-cv-01547-GMN-NJK, 2013 WL 6184940 (D. Nev. Nov. 22, 2013) ...............12, 14

*Phillips v. C.R. Bard, Inc.*,
  290 F.R.D. 615 (D. Nev. 2013).........................................................................................21

*Playstudios, Inc. v. Centerboard Advisors, Inc.*,
  No. 2:18-cv-1423-JCM-NJK, 2019 WL 6493926 (D. Nev. Dec. 3, 2019) ......................14, 15

*Playstudios, Inc. v. Centerboard Advisors, Inc.*,
  No. 2:18-cv-01423-JCM-NJK, 2019 WL 8128168 (D. Nev. July 18, 2019) .........................15

*Roche Freedman LLP v. Cyrulnik*,
  No. 21CV01746JGKSN, 2022 WL 17979801 (S.D.N.Y. Dec. 28, 2022) .............................21

*Sava v. 21St Century Spirits, LLC*,
  No. 22 C 6083, 2024 WL 3161625 (N.D. Ill. June 25, 2024) .................................................19

*Sternberg v. Warneck*,
  No. 2:23-CV-01466-APG-EJY, 2025 WL 1489701 (D. Nev. May 22, 2025).......................22

*Too Much Media, LLC v. Hale*,
  206 N.J. 209 (2011) .........................................................................................................16

OPPOSITION TO THIRD-PARTY PEREZ HILTON'S MOTION TO QUASH AND
CROSS-MOTION TO COMPEL

*United States v. Chen,*
    99 F.3d 1495 (9th Cir. 1996) .................................................................................21

*Wells Fargo Bank, N.A. v. ANC Vista I, LLC,*
    No. 2:14-CV-00840-JCM, 2015 WL 557069 (D. Nev. Feb. 11, 2015)....................20

*Wilgar v. OPM Las Vegas Corp.,*
    No. 2:19-CV-1036-RFB-EJY, 2020 WL 1433523 (D. Nev. Mar. 23, 2020) .........23

*Xcentric Ventures, L.L.C. v. Borodkin,*
    934 F. Supp. 2d 1125 (D. Ariz. 2013), *aff'd sub nom. Xcentric Ventures, LLC*
    *v. Borodkin*, 798 F.3d 1201 (9th Cir. 2015)......................................................16, 17

**Statutes**

Nev. Rev. Stat. Ann. §§ 41.660 & 41.650 ....................................................................22

Nev. Rev. Stat. Ann. § 49.275 ....................................................................................16

**Other Authorities**

16 C.F.R. 255 (2023) ...................................................................................................19

OPPOSITION TO THIRD-PARTY PEREZ HILTON'S MOTION TO QUASH AND
CROSS-MOTION TO COMPEL

Respondent Blake Lively respectfully asks the Court to deny the Motion to Quash Subpoena (ECF No. 1, "Motion" or "Mot.") filed by Movant Mario Lavandeira Jr., also known as Perez Hilton ("Lavendeira" or "Mr. Hilton"). *See* Ex [A] ("Subpoena").[1] Ms. Lively cross moves to compel Mr. Hilton to respond to and produce materials responsive to the Subpoena, which Ms. Lively served in connection with the lawsuit she initiated in December 2024 in the United States District Court for the Southern District of New York ("Issuing Court") against Wayfarer Studios LLC ("Wayfarer"), Justin Baldoni ("Baldoni"), Jamey Heath ("Heath"), Steve Sarowitz ("Sarowitz"), It Ends With Us Movie LLC, Melissa Nathan, The Agency Group LLC ("TAG"), Jennifer Abel, Jed Wallace ("Wallace"), and Street Relations Inc. (collectively, "Wayfarer Defendants"), *Lively v. Wayfarer Studios*, No. 24-cv-10049, (Dec. 31 2024, S.D.N.Y.) ("Underlying Litigation"), or alternatively, transfer the Motion and cross-motion to be heard by the Issuing Court in the Underlying Litigation. [2]

## INTRODUCTION

Perez Hilton is a social media personality who has described himself as the "original influencer." Since August 2024, Mr. Hilton has created more than 500 pieces of video content and about the same number of posts of sensational headlines—almost entirely disparaging—about actress and entrepreneur Blake Lively for reporting sexual harassment on the set of the film *It Ends With Us* ("Film"). Ms. Lively initiated the Underlying Litigation in connection with the sexual harassment she and others experienced on the set of the Film and a subsequent smear campaign launched against her in retaliation for speaking out.

The Underlying Litigation alleges that the Wayfarer Defendants began to perpetuate the retaliatory campaign in mid-August 2024 and have continued to do so through present by, for

---

[1] All exhibits are attached to the Declaration of Richard Pocker.

[2] Ms. Lively filed a Second Amended Complaint in July 2025, which is attached as Exhibit B for ease of reference. All citations to other filings in the Underlying Litigation docket refer to *Lively v. Wayfarer Studios LLC*, 1:24-cv-10049, (S.D.N.Y.). The Court can take judicial notice of all court filings. *Harris v. Cnty. of Orange*, 682 F.3d 1126, 1132 (9th Cir. 2012); *see Hurst-Castl v. Long Term Cap. P'ship VI, LLC*, No. 2:24-CV-02334-GMN-MDC, 2025 WL 1266736, at *4 (D. Nev. Apr. 30, 2025) ("Courts are especially warranted in taking judicial notice of related proceedings in another (or the same) court if those proceedings have a 'direct relation to matters at issue.'").

1    example, encouraging third-party online content creators (including but not limited to Mr. Hilton)

2    to spread disparaging (and false) narratives about Ms. Lively, including that she is a liar and a

3    bully who invented her claims in order to achieve power and control over the Film. Mr. Hilton

4    began parroting those talking points in August 2024 and continues to do so to this day, publicly

5    declaring that Ms. Lively's allegations of retaliation are "Non-Existent" and that she is a "BULLY"

6    who "LIES" and is "Trying To Silence Justin Baldoni." Mr. Hilton's videos are punctuated by

7    name-calling Ms. Lively, coining mocking terms for her, including "***Blackface Blake***", "***Lying***

8    ***Lively***", "***Ku Klux Khaleesi***", and "***Litigious Lively***". Defendant TAG (a public relations firm that

9    specializes in crisis communications) has admitted in sworn interrogatory responses that Mr.

10   Hilton is one of the content creators who seeded, generated, created, or influenced social media

11   content or provided "related digital or social media services directly or indirectly **at the request**

12   **of, or on behalf of, any Wayfarer Party or their agents or affiliates**."

13            Neither Mr. Hilton nor the Wayfarer Defendants nor their counsel deny that they have

14   communicated with each other about Ms. Lively throughout the last year. Ms. Lively has been

15   attempting to obtain those communications *for many months*, including from the Wayfarer

16   Defendants. But Ms. Lively has yet to receive a single one. The Wayfarer Defendants have refused

17   to produce any communications sent by their agents or on their behalf. And, now—through both

18   this Motion *and* a motion for a protective order he filed in the Issuing Court—Mr. Hilton seeks to

19   preclude Ms. Lively from learning which pieces among the avalanche of derogatory content

20   described above were created "at the request of, or on behalf of" the Wayfarer Defendants. With

21   document discovery already closed, Ms. Lively finds herself in a circular shell game designed to

22   keep the retaliation scheme, in their words, "untraceable."

23            The Court need not consider the merits of the Motion and could (and should) instead

24   transfer this matter for purposes of judicial economy and federal comity to the Issuing Court, which

25   is poised to rule on Mr. Hilton's request for relief in connection with the Subpoena. *See infra*

26   Argument § I. If the Court chooses to consider the Motion's merits, it should reject them as

27

28

OPPOSITION TO THIRD-PARTY PEREZ HILTON'S MOTION TO QUASH AND
CROSS-MOTION TO COMPEL

baseless. *Id.* § II. Not only should the Court deny the Motion, it should compel Mr. Hilton to produce all materials responsive to the Subpoena within seven days of this Order. *Id.* § III.

## BACKGROUND

**A.    Ms. Lively Filed The Underlying Litigation Asserting Claims of Sexual Harassment, Retaliation, and Defamation, Among Others.**

Ms. Lively starred in the Film, Baldoni directed it and also starred in it, and Wayfarer—the movie studio owned by Baldoni and his billionaire business partner, Sarowitz, and whose CEO is Heath—produced and owns it. Ex. [B] ¶¶ 2, 57–60. During filming, Ms. Lively reported on-set sexual harassment and misconduct, including that Baldoni: divulged information about his sex life; made derogatory, degrading, and sexual comments; described his own genitalia; improvised unwanted intimacy that had not been rehearsed, choreographed, or discussed with Ms. Lively in advance; added graphic content to the script, including multiple new scenes with nudity, and on-camera orgasm; and added unscripted nudity to a birthing scene for which he cast his friend as Ms. Lively's OBGYN. *Id.* ¶¶ 7, 75–139. A resulting contractual rider to Ms. Lively's actor agreement laid out 17 specific protections to ensure a safe set, including a mandate that Baldoni, Heath, Wayfarer, and others not retaliate against Ms. Lively "for raising concerns or requesting safeguards." *Id.* ¶¶ 146–150, 158.

As promotional events for the Film began in the summer of 2024, Baldoni became concerned that Ms. Lively would speak publicly about the on-set harassment and solicited the assistance of crisis management experts, TAG, Nathan, and Abel, and Sarowitz, who promised to spend "$100 million" to ruin Ms. Lively's and her family's lives. *Id.* ¶¶ 26, 169, 193–199, 297. TAG devised a "Scenario Planning" document dated August 2, 2024 suggesting they could "get ahead" of Ms. Lively by "planting stories" about her, including that she had a "less than favorable reputation" and accusing her of "bullying" her way into positions of power and taking control of the Film. *Id.* ¶¶ 31, 203–207. In one text message, Ms. Nathan explained "***we can bury anyone***" but cautioned they should not tell Baldoni in writing that they "***will destroy***" Ms. Lively because "***[i]magine if a document saying all the things that he wants ends up in the wrong hands.***" *Id.* ¶¶ 5, 33–34, 48, 209 (emphasis added). The next day, Ms. Nathan provided pricing quotes ***ranging***

*from $75,000 to $175,000 per month* for "the *creation of social fan engagement* to go back and forth with any negative accounts, helping to *change narrative*" for the former and for a "full reddit, full social account take downs, full social crisis team on hand for anything – engage with audiences in the right way, *start threads of theories* (discuss) this is the way to be fully 100% protected" for the latter. *Id.* ¶¶ 29, 213–214. Ms. Nathan emphasized: "*All of this will be most importantly untraceable.*" *Id.* (emphasis added).

On August 7, 2024, Abel and Nathan agreed that "*we really need to put the social combat plan*" into "motion" and, around that time, a Texas-based contractor named Jed Wallace and his "crisis management" company were hired to do just that. *Id.* ¶¶ 215, 224–293. They would feed pieces of manufactured narratives to online content creators and influencers, who would help content go viral to influence public opinion and cause an organic pile-on. *Id.* Before the end of the month, the Wayfarer Defendants reported that Ms. Lively was seeing an "overwhelming tide of negative publicity" and "social media had turned against" her and her husband, Ryan Reynolds. *Id.* ¶¶ 258, 324–339.

The relentless media influence and "digital manipulation" strategy to convince the public that Ms. Lively, rather than Baldoni, is the aggressor and bully has continued to date. *Id.* ¶¶ 8, 48, 343, 451, 453. Much of this phase has taken place in the form of statements by the Wayfarer Defendants' lawyer, Bryan Freedman, who regularly issues inflammatory content to media outlets and content creators, and some of his statements form the basis of a defamation claim of defamation in the Underlying Litigation. *Id.* ¶¶ 73, 83, 221, 298–299.

**B. Hilton, Who Identifies Himself As An "Influencer," Has Posted More Than 540 Disparaging Pieces Of Content About Ms. Lively.**

Mr. Hilton describes himself as an "influencer":

The *original influencer*, Perez Hilton founded and oversees one of the most iconic websites ever. In addition to his eponymous blog, he is the host of a very successful podcast, has a loyal following across two YouTube channels, has written three books, has acted in countless TV shows and films - as well as the stage.

Ex. [C] ("YouTube Channel") (emphasis added); Ex. [D] (describing himself on his Instagram profile (@thePerezHilton) as "The Original Influencer"). In a 2021 interview, he labeled himself

"a working influencer" and a "working creator."[3] Mr. Hilton creates content primarily for his YouTube Channel, his X account (@theperezhilton) and the website "PerezHilton.com" ("Website") (collectively, "Platforms"), on which he calls himself "the internet's most notorious gossip columnist" and boasts being the "#1 Web Celeb." Ex. [E]. He calls himself a "media personality" his X profile. Ex. [F]. Mr. Hilton has been dubbed a "pop culture expert," including in a "documentary" titled *In Dispute: Lively vs. Baldoni*, in contrast to other participants labeled as "reporter."[4] On his various Platforms, Mr. Hilton does not hold himself out as operating as an independent journalist, nor does he purport to follow any of the tenets of independent journalism, such as for example diligently seeking "subjects of news coverage to allow them to respond to criticism" or labeling "advocacy and commentary."[5]

Mr. Hilton has boasted that he is the "**number one source for all things It Ends With Us Saga**."[6] Since August 2024, Mr. Hilton has posted more than *500 videos*, *400 headlines*, and *hundreds of other comments* about Ms. Lively on his various platforms, and his Website includes a tab on its landing page and an entire subpage dedicated to Ms. Lively.[7] The majority of the content Mr. Hilton posts about Ms. Lively is disparaging, published without reaching out to Ms. Lively's representatives for comment or response, and generally regurgitates messaging that appears to be prepared by others:[8]

---

[3] William Turvill, *Perez Hilton Interview: How Hollywood's 'Most Hated' Sacrificed Clicks (And Ad Revenue) For His Conscience*, Press Gazette (Sep. 30, 2022 at 10:30 BST) https://pressgazette.co.uk/news/perez-hilton-interview/.

[4] *See Perez Hilton Podcast with Chris Booker*, Apple Podcasts, https://podcasts.apple.com/us/podcast/the-perez-hilton-podcast-with-chris-booker/id1019700531 (last visited Aug. 1, 2025); IN DISPUTE: BALDONI V. LIVELY, HBO MAX, at 2:56, 4:45,10:25 (ITN Productions 2025).

[5] https://www.spj.org/spj-code-of-ethics/

[6] *See e.g., Perez Hilton, Blake Lively Is Trying To Ruin A Small Business Owner! SICKENING! This Is Not Pro-Woman! She Just* (YouTube, Jun. 6, 2025, at 0:26) https://www.youtube.com/watch?v=o4xkQuthYWw.

[7] *See, e.g.* Ex. [G]; *see also* PEREZ HILTON (@perezhiltononreddit), REDDIT, https://www.reddit.com/user/PerezHiltonOnReddit/; PEREZHILTON (@ThePerezHilton), TWITTER, https://x.com/ThePerezHilton; Perez Hilton, Blake Lively, https://perezhilton.com/category/blake-lively/ (last visited Aug. 4, 2025).

[8] Importantly, Mr. Hilton's comments exactly mirror the four themes of character assassination that the Wayfarer Defendants' counsel, Bryan Freedman, has improperly advanced since the inception of this case. *See* Underlying Litigation, ECF No. 535.

• "Blake Lively's Non-Existent Smear Campaign Falls Apart!!!!"

• "Blake Lively is so UNETHICAL!"

• "Blake Lively The BULLY!"

• "Justin Baldoni Exposes New Blake Lively LIES!!! THIS IS SAVAGE"

• "Don't Believe The Blake Lively LIES!"

• "Justin Baldoni Had NOTHING To Do With Jenny Slate's Complaint! Blake Lively Lied!"

• "Blake Lively Is Trying To Silence Justin Baldoni! He's Afraid"

Ex. [G].[9] In his videos, Mr. Hilton has called Ms. Lively disparaging and insulting names, such as: "*Blackface Blake*"[10]; "*Lying Lively*"[11]; "*Ku Klux Khaleesi*"[12]; and "*Litigious Lively*."[13] Mr. Hilton has made no secret of his lack of independence—he does not, for example, reach out to Ms. Lively or her representatives for comment prior to publishing, nor is it clear he speaks with any "party" other than representatives of Mr. Baldoni. He frequently speaks as an advocate of Mr. Baldoni, rather than an independent reporter, including by celebrating Mr. Baldoni's legal

---

[9] PEREZ HILTON, *Blake Lively's Non-Existent Smear Campaign Falls Apart!!!!* (YouTube Aug.2, 2025) https://www.youtube.com/watch?v=EApfr4W0h7s; PEREZ HILTON, *Blake Lively isso UNETHICAL!* (YouTube Jul.25, 2025) https://www.youtube.com/watch?v=EApfr4W0h7s.; PEREZ HILTON, *Blake Lively The BULLY!* (YouTube Mar. 19, 2025) https://www.youtube.com/watch?v=VZhKVuc8xIc.; PEREZ HILTON, *Justin Baldoni Exposes New Blake Lively LIES!!! THIS IS SAVAGE* (YouTube Jul.8, 2025) https://www.youtube.com/watch?v=Lrz7OoHCanU; PEREZ HILTON, *Don't Believe The Blake Lively Lies! | PerezHilton* (YouTube, Mar. 12, 2025); https://www.youtube.com/watch?v=X4DwqqaiAFE; PEREZ HILTON, *Justin Baldoni Had NOTHING To Do With Jenny Slate's Complaint! Blake Lively Lied!* (YouTube Feb. 21, 2025) https://www.youtube.com/watch?v=DovL-2TK-VM.; PEREZ HILTON, *Blake Lively Is Trying To Silence Justin Baldoni! He's Afraid* (YouTube Jan. 22, 2025) https://www.youtube.com/watch?v=2h-Ml5nPYCw.
[10] PEREZ HILTON, *Blake Lively Confesses To The Judge That She's Conspiring With Justin Baldoni's Former Publicist!*, (YouTube, Jul. 5, 2025, at 1:41) https://www.youtube.com/watch?v=lPx74XA4z_A.
[11] PEREZ HILTON, *Blake Lively Has This Judge In Her Pocket! He Just:*, (YouTube, Jul. 14, 2025, at 0:31) https://www.youtube.com/watch?v=4wAoa2RjgyU.
[12] PEREZ HILTON, *A Terrible Day For Blake Lively! Another Loss For Her!! The Judge In The Justin Baldoni Trial Ruled:*, (YouTube, Jun. 16, 2025, at 0:40) https://www.youtube.com/watch?v=o0D-d4MTRv8.
[13] PEREZ HILTON, *Blake Lively Is Trying To Ruin A Small Business Owner! SICKENING! This Is Not Pro-Woman! She Just:*, (YouTube, Jun. 6, 2025, at 1:30) https://www.youtube.com/watch?v=o4xkQuthYWw.

OPPOSITION TO THIRD-PARTY PEREZ HILTON'S MOTION TO QUASH AND CROSS-MOTION TO COMPEL

successes, lamenting Ms. Lively's, and stating unequivocally: "**I am team the truth, I believe Justin.**"[14]

## C. Ms. Lively Served The Subpoena after Defendant TAG Identified Him As Having Generated Content On Its Behalf.

On March 14, 2025, Ms. Lively served interrogatories on Defendant TAG, including ones that asked TAG to identify: "***all Content Creators*** with whom You have communicated in any manner, concerning Ms. Lively, Mr. Reynolds, the CRD Complaint, the Actions, the Lively/Reynolds Companies, or the Digital Campaign from May 1, 2024, to present." Underlying Litigation, ECF No. 451-1 at 12. The Court compelled TAG *inter alia* to answer the interrogatory subject to defining Content Creators to "mean 'any individual or entity who seeds, generates, creates, or influences Social Media content or provides related digital or social media services directly or indirectly at the request of, or on behalf of, any Wayfarer Party or their agents or affiliates.'" *Id*., ECF No. 355, at 3–4. On June 25, 2025, TAG served supplemental responses to the interrogatories, including to identify Mr. Hilton as one of four Content Creators who met that description. *Id*., ECF No. 451-1 at 12. Ms. Lively has served multiple requests for production

---

[14] *See* Perez Hilton, *Throwing A Tantrum? Justin Baldoni Insists That Blake Lively's Celebrity Status Enabled Her To:*, (YouTube, Jul. 13, 2025, at 1:37), http://youtube.com/watch?v=Nl5DqAgMwP8_ (***I am team the truth, I believe Justin.***"); *see also, e.g.*, Perez Hilton (@PerezHiltononReddit), REDDIT, (Jun. 25, 2025) www.reddit.com/r/ItEndsWithLawsuits/comments/1lk7x9k/comment/mzqvkmj/ ("***my big worry is - Blake will 'find' a bunch of cast and crew members to testify that they witnessed Baldoni sexually harassing her***."); *see also* Perez Hilton, *A Terrible Day For Blake Lively! Another Loss For Her!! The Judge In The Justin Baldoni Trial Ruled:* (YouTube Jun. 16, 2025, at 1:00) https://www.youtube.com/watch?v=o0D-d4MTRv8 (***The judge has given us another win for Justin and the Wayfarer Parties.***"); Perez Hilton, *More Bad News For Justin Baldoni! He's Going To Lose This Too:* (YouTube, Jul. 14, 2025, at 1:12) https://www.youtube.com/watch?v=Ej99LG_hQfs (***The judge does not like logical… Lying Liman***."); Perez Hilton, *Justin Baldoni SCHOOLS Blake Lively's Publicist! Taunts Her To File A New Lawsuit!* (YouTube, Jul. 8, 2025, at 0:20, 2:29), https://www.youtube.com/watch?v=W5nrkzaVkPk&t=27s (***As we painfully know last month Judge Liman tossed into the garbage Justin Baldoni's lawsuit***") (Perez Hilton, *Justin Baldoni Has EVIDENCE That Blake Lively Is A Mean Girl! She Mocked His Body!!! Cruelly):*, (YouTube, Jan. 16. 2025, at 0:23, 3:33) ("***game over for Blake Lively")("[Justin Baldoni] has got the evidence***"); Perez Hilton (@perezhilton), *Blake Lively Has This Judge In Her Pocket!*, YouTube, at 2:46 (Ju1. 14, 2025) https://www.youtube.com/watch?v=4wAoa2RjgyU ("We are clearly seeing a pattern of [Judge Liman] having bias.").

---

seeking communications with content creators, including Mr. Hilton. *See id.*, ECF No. 556-2 at 47, 78, 102, 126, 152, 176, 203. No one, including Mr. Hilton, denies that such communications exist. *See* Mot. at 3 (noting "private communications"). To date, none of the Wayfarer Defendants has produced a single communication with Mr. Hilton, including any sent by their agents or on their behalf. *See* Underlying Litigation, ECF No. 552. On August 4, Ms. Lively filed a motion to compel such communications, which is briefed and pending a decision. *Id.*

**D.    Ms. Lively Served The Subpoena And Mr. Hilton Has Sought Relief Relating To It Both In The Issuing Court And This One.**

Ms. Lively served the Subpoena on Mr. Hilton personally via email on July 19, 2025 with a response date of August 4, 2024. Ex [A]. The Subpoena includes seven RFPs that seek, generally speaking: (1) all agreements and all documents and communications concerning any agreements with anyone, including but not limited to counsel for the Wayfarer Defendants, concerning the Underlying Litigation, the Film, Ms. Lively, Mr. Reynolds, and other specific allegations in Ms. Lively's Complaint; (2) all documents and communications about Mr. Hilton's digital, online, Content Creator, or influencer services or strategy or any talking points or statements or the like provided to him about the same; (3) any documents and communications relating to payment from any of the Wayfarer Defendants. *See* Ex. [A].

On July 21, 2025, Mr. Hilton emailed Ms. Lively's counsel stating that he intended to proceed *pro se*—notwithstanding that Mr. Hilton is not indigent and previously has been represented by the Wayfarer Defendants' lead attorney, Mr. Freedman—and had "substantive objections" and "significant concerns" about whether the Subpoena "complies with applicable legal standards." Ex. [G].[15] Ms. Lively's counsel responded by expressing a willingness to hear any concerns and requested Mr. Hilton put them in writing. *Id.* Mr. Hilton responded by stating that it was his "understanding that the subpoena is not legally sound" and requested Ms. Lively withdraw the Subpoena in its entirety. *Id.* In response to Ms. Lively's counsel asking for the "legal

---

[15] Mr. Freedman and Mr. Hilton have known each other for more than fifteen years. Mr. Freedman represented Mr. Hilton in a 2008 lawsuit in connection with Mr. Hilton's alleged publication of a woman's full name and e-mail address on his website. *See* https://www.hollywoodreporter.com/business/business-news/perez-hilton-wins-5-year-432980/.

OPPOSITION TO THIRD-PARTY PEREZ HILTON'S MOTION TO QUASH AND CROSS-MOTION TO COMPEL

basis and supporting authority" for that belief, Mr. Hilton responded that he intended to file a motion to quash if Ms. Lively did not withdraw the Subpoena. *Id.*

On July 29, 2025, Mr. Hilton filed a motion in the Issuing Court, requesting "a protective order requiring Plaintiffs to obtain leave of Court before issuing any further non-party subpoenas in this case." Ex. [I] ("Motion for a PO") at 3. In the Motion for a PO, Mr. Hilton sought relief relating to the Subpoena, stating that he "was served with a sweeping third-party subpoena issued by Plaintiff's counsel, demanding private communications, unpublished materials, and internal records" and calling it "burdensome" and amounting to a "fishing expedition[]." *Id.* Mr. Hilton accused Ms. Lively's counsel of "abusive discovery practices." *Id.* Mr. Hilton confirmed that he voluntarily was availing himself of the Issuing Court even though it was not his "job or responsibility" to do so. *Id.* at 2.

On Saturday, August 2, 2025, Mr. Hilton sent counsel for Ms. Lively an email attaching the Motion, which bears an ECF stamp of July 28, 2025. Ex. [G]. Counsel for Ms. Lively responded by email, including to state:

> On a procedural note, you attempted to serve the Nevada Motion to Quash via email. ***We would be willing to agree to accept service via email with the date of service being Monday, August 4, 2025***. Please let us know if we have an agreement and you can advise the Court of your service of the motion via counsel by agreement.

Pocker Decl. ¶ 10 (emphasis added).[16] Mr. Hilton responded that "August 4th is fine." *Id.*[17]

On August 5, Ms. Lively filed an opposition to the Motion for a PO and a cross motion to compel compliance in the Issuing Court. Ex. [J] ("Opposition and Cross Motion"). In the Opposition and Cross Motion, Ms. Lively argued that Mr. Hilton failed to state a legal basis for a protective order and that, by seeking relief in connection with the Subpoena, he had availed himself

---

[16] Mr. Hilton emailed Ms. Lively's counsel on July 31, 2025 about having filed the Motion but without attaching it or requesting acceptance of service by email.

[17] Also on August 2, 2025, Mr. Hilton filed a letter with the Issuing Court providing "Notice" of the Motion filed in this Court, in which he stated inter alia: "It is my immense pleasure that this will all be decided in Nevada and not in your court, where - in my opinion - you have shown clear bias in favor of the defendant and have ruled in a manner that is shameful and of great concern for the public." Ex. [K] at 5.

9

of the Issuing Court. *Id.* at 25 –26. Accordingly, Ms. Lively cross moved to compel compliance with the Subpoena and asserted many of the same arguments made below. *See id.*

Mr. Hilton filed multiple letters on the Issuing Court's docket in response, which included the following inappropriate statements, among others (*see, e.g.*, Ex. [K] at 28, 30, 38), which he then commented about at length in videos produced on his various social-media Platforms:

- "I would also like to publicly thank Ms. Lively and her mediocre legal team for choosing to serve me a legally unsound and unenforceable subpoena against me - issued out of your court. In doing so, Lively and her counsel have now given me the right to respond and be heard by this court . . . ." *Id.* at 33;

- "I feel like we're starting to be pals with how much I'm writing to you! But, I know you're still much friendlier with Blake Lively's counsel. This letter is NOT a response to the Motion To Compel just filed in your court by the disgraceful Esra Hudson. This letter is a request for sanctions against Ms. Hudson, which your sexy and smart self has every right to impose on that clown - based on your inherent powers in this court." *Id.* at 37

- "Additionally, I have no interest in responding to the plantation-loving princess' opposition to my Motion For A Protective order. I do not believe that this court can rule fairly. I fully expect you to once again side with Ms. Lively, as I believe you are biased." *Id.* at 40.

On August 8, the Issuing Court entered an order remarking that "a number of filings in this case have included intemperate language and personal attacks against parties, their counsel, and the Court" and advising all "individuals filing documents in this case—whether represented or not— are advised that they shall not in any submission to this Court use language that is disrespectful of the parties, their counsel, or the Court." Underlying Litigation, ECF No. 581 (internal citations omitted). The Issuing Court explained that future "use of such language in any Court submission" "may subject the infringing party to risk of contempt." *Id.*

Also on August 8, 2025, the Issuing Court entered an Order referring to the Motion before this Court:

The Court is aware that Lavandeira has filed a motion to quash . . . [and] taken the position that he will not otherwise respond to Lively's cross motion in this Court. . . . . However, Lively also has a right to have her cross motion decided. Accordingly, . . . the Court will consider Lively's cross motion to be fully submitted and will decide it without the benefit of an opposition brief.

> Given Lavandeira's pro se status and the special solicitude that status is owed, the Court advises Lavandeira that, should he fail to respond to Lively's cross motion and should the Court determine that it has jurisdiction to compel, Lavandeira risks waiving any arguments that Lively's motion is improper . . . even if he has separately raised those arguments in his motion to quash in the District of Nevada.

*Id*., ECF No. 583. Mr. Hilton filed a response the same day, stating that he understood Ms. Lively intended to oppose the Motion in this Court by August 18th, and requesting an extension and to know if the Issuing Court had jurisdiction over him. *Id*., ECF No. 592.[18] The Issuing Court denied the request for an extension, explaining that it would not determine the jurisdictional issue until briefing is complete on August 13, 2025. *Id*., ECF No. 589. Mr. Hilton then filed another request for an extension, asking the Issuing Court to "pause" the proceedings until this Court "rules on my ***pending motion to quash the same subpoena***." *Id*., ECF No. 629 (emphasis added).[19] The Issuing Court denied Mr. Hilton's request for what amounted to a stay, stating:

> Lavandeira is free to argue in his opposition to the motion to compel that the Court should defer ruling until the district court in Nevada has ruled. It appears, however, that Lavandeira has not yet properly served his motion to quash in the District of Nevada*, see* No. 25-cv-1396 (D. Nev. filed July 28, 2025), and the Court does not assume, nor should Lavandeira, that it will necessarily defer ruling in favor of a proceeding that is now further behind than the one in this Court. To the extent Lavandeira has already argued in his motion to quash that the subpoena is improper, he is free to repeat those arguments in his briefing here.

*Id*., ECF No. 627.

## LEGAL STANDARD

Rule 45 of the Federal Rules of Civil Procedure ("Rule" or "Rules") governs the issuance of subpoenas to individuals who are not parties to the underlying litigation. *Hornor v. Wey*, No. 2:22-CV-01840-RFB-DJA, 2025 WL 1617589, at *1 (D. Nev. May 8, 2025) (Albregts, J.). "The movant seeking to quash a subpoena bears the burden of persuasion." *Id*. "It is well established

---

[18] Notwithstanding agreeing to an August 4, 2025 date of service and acknowledging to the Issuing Court that Ms. Lively intended to oppose the Motion by August 18, 2025, Mr. Hilton filed a notice in this matter on August 12, 2025 asked the Court grant the Motion as "unrebutted" because "the failure of an opposing party to file points and authorities in response to a motion constitutes a consent to the granting of the motion." *Id*. ECF No. 8.

[19] *See* Ex. [K] (compiling Underlying Litigation, ECF Nos. 541, 558, 573, 574, 578, 579, 580, 590, 592, 625, 653, 654, 655); *see also, e.g.,* Underlying Litigation ECF Nos. 470, 471, 478, 479.

1  that the scope of discovery under a subpoena issued pursuant to Rule 45 is the same as the scope

2  of discovery allowed under Rule 26(b)(1)." *Paws Up Ranch, LLC v. Green*, No. 2:12-cv-01547-

3  GMN-NJK, 2013 WL 6184940, at *4 (D. Nev. Nov. 22, 2013) (quotation omitted). Rule 26 entitles

4  the serving party to "any non-privileged matter that is relevant to any party's claim or defense and

5  proportional to the needs of the case, considering the importance of the issues at stake in the action,

6  the amount in controversy, the parties' relative access to relevant information, the parties'

7  resources, the importance of the discovery in resolving the issues, and whether the burden or

8  expense of the proposed discovery outweighs its likely benefit." Fed. R. Civ. P. 26(b)(1).

9      A third party subject to a subpoena may challenge the subpoena in the district where

10  compliance is required. *See* Fed. R. Civ. P. 45(d). "When the court where compliance is required

11  did not issue the subpoena, it may transfer a motion under this rule to the issuing court if the person

12  subject to the subpoena consents or if the court finds exceptional circumstances." Fed. R. Civ. P.

13  45(f). The Advisory Committee Notes for the 2013 Amendment explain the "transfer may be

14  warranted in order to avoid disrupting the issuing court's management of the underlying litigation,

15  as when that court has already ruled on issues presented by the motion or the same issues are likely

16  to arise in discovery in many districts." Fed. R. Civ. P. 45 Advisory Committee Notes for 2013

17  Amendment. Transfer is appropriate when those "interests outweigh the interests of the nonparty

18  served with the subpoena in obtaining local resolution of the motion." *Id.*; *Argento v. Sylvania*

19  *Lighting Servs. Corp.*, No. 2:15-CV-01277-JAD-NJ, 2015 WL 4918065, at *4 (D. Nev. Aug. 18,

20  2015). "Whether to transfer a subpoena-related motion is committed to the discretion of the court

21  where compliance is required." *Id*.

**ARGUMENT**

**I.  THE COURT SHOULD TRANSFER THE MOTION TO THE ISSUING COURT.**

24      Exceptional circumstances warrant transferring the Motion to the Issuing Court. Fed. R.

25  Civ. P. 45(f); *see Apple v. Csaa Gen. Ins. Co.*, No. 2:19-cv-01093-RFB-DJA, 2021 WL 3216465,

26  at *2 (D. Nev. July 29, 2021). Mr. Hilton concedes that he filed a "related motion" in the Issuing

27  Court in which he asked for relief in connection to "the very same subpoena at issue here." Mot.

28  at 17. Mr. Hilton has lodged more than twenty notices or letters with the Issuing Court, including

to seek a protective order in connection with Subpoena. *Supra* at 9–10; *see* Ex. [K]. By "previously invoking that court's jurisdiction to challenge the exact same subpoena," Mr. Hilton has waived his right to argue against transfer because permitting him to challenge "the same subpoena twice in two different courts" would violate "fundamental principles of both fairness and efficient judicial case management to allow a party to challenge the same subpoena twice in two different courts." *Argento*, 2015 WL 4918065, at *4.[20]

Separate from waiver, efficient management of the Underlying Litigation, judicial economy, and the doctrine of federal comity strongly counsel in favor of transfer. *See Apple*, 2021 WL 3216465, at *2 ("[T]he doctrine of federal comity permits one district to decline judgment on an issue which is properly before another district"). The Issuing Court is familiar with the full scope of issues relevant to the Underlying Litigation and the Subpoena in particular, the merits of which the Issuing Court is prepared to consider. *See* Underlying Litigation, ECF No. 627 (rejecting Mr. Hilton's request to abstain from resolving Mr. Hilton's objections to the Subpoena pending resolution of this Motion); *Argento*, 2015 WL 4918065, at *5 (transferring where "issuing court ha[d] already outlined the contours of the scope of relevant [discovery]" and considered "the scope of relevant documents for which production is required under the subpoena"). The "risk of inconsistent rulings further militates in favor of transferring" the Motion to the Issuing Court. *Id*. Transferring the Motion is particularly critical to allow for the Issuing Court to manage its own docket in accordance with the case's expedited timeline, which contemplates the close of fact discovery on September 30, 2025, and a trial date of March 9, 2026. *Id*. ("[T]he Court can think of few intrusions more disruptive to the issuing court's ability to manage the underlying litigation than an order from this Court that may well impact the ability of the case to move forward" on the "timeline preferable" to the Issuing Court). Mr. Hilton has no reasonable basis to claim that transfer would be burdensome given that he is actively monitoring the docket and, recently, has been submitting filings to the Issuing Court on a daily basis.

---

[20] Further, Mr. Hilton's own sworn statement in the Underlying Litigation directly contradicts any assertion that this dispute must be resolved in Nevada because other venues would be burdensome due to his residency. But in connection with a certificate of service executed on August 13, 2025, Mr. Hilton declared that his address is in Los Angeles. Ex. [K] at 73.

1   **II.      IN THE ALTERNATIVE, THE COURT SHOULD DENY THE MOTION.**

2   **A.      The Subpoena Does Not Impose Any Undue Burden On Mr. Hilton.**

3           Mr. Hilton claims that the Subpoena "places an undue and unjustifiable burden" on him as

4   a non-party because he has "no involvement whatsoever in the underlying litigation" and

5   compliance "would require extensive effort to review, compile, and potentially testify about

6   private or unpublished material" that is "not alleged to possess unique information relevant to any

7   claim or defense in the case." Mot. at 3–4. Conclusory assertions aside, Mr. Hilton does not explain

8   how the Subpoena seeks irrelevant information. Nor can he. How the Wayfarer Defendants, or

9   individuals acting on their behalf, perpetuated the smear campaign against Ms. Lively (including

10  by enlisting content creators like Mr. Hilton) to generate pro-Baldoni, anti-Lively content, and

11  what the Wayfarer Parties communicated to third parties about Ms. Lively, are central to the

12  retaliation and defamation claims in this case. The "liberal standard" of relevance is met where, as

13  here, the Subpoena seeks information that is probative of essential elements of proof. *See*

14  *Playstudios, Inc. v. Centerboard Advisors, Inc.*, No. 2:18-cv-1423-JCM-NJK, 2019 WL 6493926,

15  at *4 (D. Nev. Dec. 3, 2019) finding relevance where "information requested has some probative

16  value" and there is a "possibility of discovering highly probative evidence"); *see also Paws Up*

17  *Ranch*, 2013 WL 6184940, at *4 (holding relevance is a "liberal standard").

18          None of Mr. Hilton's other arguments demonstrates undue burden either. Mr. Hilton's

19  argument that the Subpoena amounts to a "fishing expedition" is belied by the seven requests

20  themselves, which are limited to: (i) communications, agreements, or understandings between Mr.

21  Hilton and the Wayfarer Defendants or their counsel; (ii) documents or communications reflecting

22  the receipt or use of any content supplied by those individuals; and (iii) any consideration received

23  in connection with such content. *Compare* Ex. [A], *with* Mot. at 16 (describing Subpoena as

24  seeking "unspecified communications and materials unrelated to any known claim"). As discussed

25  above, that information is central to Ms. Lively's case, including to explore the Wayfarer Parties'

26  efforts to use content creators, such as Mr. Hilton, to seed, generate, create, or influence public

27  narratives about Ms. Lively in order to perpetuate retaliation campaign. *Cardinali v. Plusfour, Inc.*,

28

No. 2:16-cv-02046-JAD-NJK, 2018 WL 7502644, at *3 n.3 (D. Nev. Oct. 9, 2018) ("[T]here is already a sufficient body of evidence that belies any contention that this line of inquiry is merely a fishing expedition" as opposed to a "permissible exploration of facts that may be fruitful"). Even if the Court is to credit Mr. Hilton's grievances that responding to the subpoena will require "extensive effort"—which implicitly indicates that there is a wealth of responsive materials—non-parties are not exempt from complying with civil discovery just because there may be *some* burden imposed.[21] *Jackson v. Montgomery Ward & Co.*, 173 F.R.D. 524, 529 (D. Nev. 1997) (explaining that "just because complying with a discovery request will involve expense or may be time consuming, does not make it unduly burdensome" without "alleg[ing] specific facts which indicate the nature and extent of the burden"). Moreover, Mr. Hilton cannot meet his burden by merely asserting "conclusory and speculative statements of harm, inconvenience, and expense" in the absence of "any specific facts to indicate the nature and extent of the burden." *Playstudios, Inc. v. Centerboard Advisors, Inc.*, No. 2:18-cv-01423-JCM-NJK, 2019 WL 6493926, at *5 (D. Nev. Dec. 3, 2019) (denying motion to quash where "the court finds a conspicuous omission from the non-parties' objection: any discussion of what burden the subpoenas impose on them").

Finally, Mr. Hilton's insistence that he lacks "***unique*** information" and that Ms. Lively can seek the same information from the Wayfarer Defendants does not constitute undue burden. *See* Mot. at 3, 9–10. Ms. Lively ***has*** "sought other means to obtain the materials" but still does "not already possess the information" requested in the Subpoena, even after filing a motion to compel such documents. *See* Underlying Litigation, ECF No. 552; *Playstudios, Inc. v. Centerboard Advisors, Inc.*, No. 2:18-cv-01423-JCM-NJK, 2019 WL 8128168, at *3 (D. Nev. July 18, 2019); *accord Banq*, 2025 WL 1938754, at *2 (rejecting undue burden argument that requesting party is

---

[21] The Court need not accept Mr. Hilton's representations that he has "no involvement whatsoever in the underlying litigation" because that is not the operative legal standard and, even if it were, such a determination would improperly wade into the merits of the underlying litigation. *Banq, Inc. v. Purcell*, No. 2:22-CV-00733-APG-DJA, 2025 WL 1938754, at *2 (D. Nev. July 14, 2025) (Albregts, J.) (declining the "invitation to delve into the weeds of these ongoing cases" and "opining on the merits" that are "strongly contested by the parties"). Moreover, such a representation is belied by Mr. Hilton's admission that he possesses responsive information and his repeated public proclamations that he possesses materials related to the underlying dispute.

OPPOSITION TO THIRD-PARTY PEREZ HILTON'S MOTION TO QUASH AND
CROSS-MOTION TO COMPEL

"not permitted to obtain information" from a third-party "simply because defendants might also have that information"). Plus, the Subpoena seeks information that may *not* be in the possession, custody, or control of the Wayfarer Parties depending upon how Mr. Hilton obtained it.

The Court should not quash the Subpoena on undue burden grounds because Mr. Hilton has failed to demonstrate, as he must, that the Subpoena poses any such burden on him.

**B.    The Subpoena Does Not Seek The Disclosure Of Privileged Materials.**

1.    <u>The Subpoena does not seek material covered by the Nevada Shield Law.</u>

i.    *Mr. Hilton was not acting as a "professional journalist" when he generated the materials sought.*

To avail himself of a reporter's privilege, Mr. Hilton must demonstrate that he was acting as a "reporter, former reporter or editorial employee of any newspaper, periodical or press association or employee of any radio or television station" when he obtained the information sought by the Subpoena. Nev. Rev. Stat. Ann. § 49.275; *Diaz v. Eighth Jud. Dist. Ct. ex rel. Cnty. of Clark*, 116 Nev. 88, 101, 993 P.2d 50, 59 (2000) (the Nevada Shield Law "extends protection only to the journalist's newsgathering and dissemination activities within the journalist's professional capacity" and "provides no protection for information gathered in other capacities"). Mr. Hilton's confirmation that his sole "journalistic enterprise" is his eponymous website PerezHilton.com that he owns and operates (Mot. at 2, 14) defeats his burden to demonstrate that he is affiliated with a "newspaper, periodical or press association or employee of any radio or television station." Courts in the Ninth Circuit interpretating similar shield laws have found that self-publishing materials fails to meet the affiliation requirement. *See Xcentric Ventures, L.L.C. v. Borodkin*, 934 F. Supp. 2d 1125, 1145 (D. Ariz. 2013), *aff'd sub nom. Xcentric Ventures, LLC v. Borodkin*, 798 F.3d 1201 (9th Cir. 2015) (finding California's shield law did not apply to a "blogger who writes on her own blog" because the statute required she be "connected with or employed upon a newspaper, magazine, or other periodical publication, or by a press association or wire service"); *Obsidian Fin. Group, LLC v. Cox,* No. CV–11–57–HZ, 2011 WL 5999334, at *1 (D.Or. Nov. 30, 2011) (same as to an unaffiliated blogger under Oregon's similar law); *accord Too Much Media, LLC v. Hale*, 206 N.J. 209, 216, 218–19, 223, 237 (2011) (privilege did not

extend "to a self-described journalist" who "exhibited none of the recognized qualities or characteristics traditionally associated with the news process, nor has she demonstrated an established connection or affiliation with any news entity"). The court in *Xentric Ventures* opined that limiting the shield law to only those individuals affiliated with a news organization is specifically designed "***to avoid the uncertainty of the law's application in today's world of blogs, tumblrs, and tweets, where anyone could claim the mantra of a reporter***." *Xcentric Ventures*, 934 F. Supp. 2d at 1145 (emphasis added). This Court should apply the same reasoning to Mr. Hilton and find that the Nevada Shield Law inapplicable because he is not affiliated with "any newspaper, periodical or press association."

Even if the lack of any such affiliation was not fatal (which it is), Mr. Hilton also does not qualify as a reporter. *See Hornor*, 2025 WL 1617589, at *1 (rejecting application of Nevada Shield Law where it was "not clear" that the movant "would fit the definition of a 'reporter, former reporter or editorial employee of any newspapers, periodical or press association or employee of any radio or television station'"). Mr. Hilton's self-description in his Motion as a "globally recognized" "journalist" who adheres "to journalist standards" is belied by the record and his own out-of-court statements. Mr. Hilton does not identify himself as a reporter on any of his Platforms. *See supra* at 1, 4–5, 6. Mr. Hilton in the Motion "invite[s]" the Court to visit PerezHilton.com "to confirm that it remains an active and ongoing journalistic enterprise" (Mot. at 2) but even a cursory review of that website indicates that Mr. Hilton does not exhibit any indicia of following the tenets of independent journalism, which is the animating principle of the Nevada Shield Law. *See* Ex. [H]; *Diaz*, 993 P.2d at 58. In *Diaz*, the Supreme Court of Nevada has explained that the Nevada Shield Law "serves an important public interest" in ensuring that "the public is able to make informed political, social and economic decisions." *Id*. (citing Testimonial Shield Statute at 801). The Second Circuit has opined on the similar legislative purpose of New York shield statute, and explained how the public interest determines the applicability of any such privilege:

> "While freedom of speech and of the press belongs to virtually anyone who intends to publish anything (with a few narrow exceptions), all those who intend to publish do not share an equal entitlement to the press privilege from compelled disclosure. Those who gather and publish information because they have been commissioned

to publish in order to serve the objectives of others who have a stake in the subject of the reporting are not acting as an independent press. ***Those who do not retain independence as to what they will publish but are subservient to the objectives of others who have a stake in what will be published have either a weaker privilege or none at all.***"

*Chevron Corp. v. Berlinger*, 629 F.3d 297, 307–08 (2d Cir. 2011) (emphasis added) (cleaned up); *accord In re Madden*, 151 F.3d 125, 130 (3d Cir. 1998) (refusing to extend the reporter's privilege to an entertainment columnist, holding that the privilege requires intent to gather and disseminate news in the public interest – not celebrity gossip or promotional content).

On his own Platforms, Mr. Hilton confirms that he does not retain independence by (accurately) describing himself as an "influencer." Merriam-Webster defines an "influencer" as "a person who is able to generate interest in something (such as a consumer product) by posting about it on social media." Influencer, Merriam-Webster Dictionary, www.merriam-webster.com/dictionary/influencer (last visited Aug. 18, 2025). TAG relied on Mr. Hilton in his capacity as an influencer to seed, generate, create, or influence content or provide "digital or social media services directly or indirectly at the request of, or on behalf of, any Wayfarer Party or their agents or affiliates." *Supra* at 6–8. Creating for-profit content based on its beneficial value to Mr. Hilton's friends and allies (including contractual counterparties), rather than its newsworthiness, strongly "weighs against" finding that Mr. Hilton was acting as reporter while communicating with the Wayfarer Defendants. *In re Fitch, Inc.*, 330 F.3d 104, 109 (2d Cir. 2003) (affirming district court's ruling that credit reporting agency did not qualify as a "journalist" where communications with the client "reveal[ed] a level of involvement with the client's transactions that is not typical of the relationship between a journalist and the activities upon which the journalist reports"); *see also Berlinger*, 629 F.3d at 307–08 ("An undertaking to publish matter in order to promote the interests of another, regardless of justification, does not serve the same public interest, regardless of whether the resultant work may prove to be one of high quality."). While an influencer can, of course, be engaged in "fathering, receiving or processing information for communications to the public," many influencers are engaged in entirely distinct types of commercial activity, such as for-profit brand or product promotion, advocacy on behalf of a person or corporation, or more. Here, the information Ms. Lively seeks from Mr. Hilton is entirely aimed

at his commercial activities that fall outside of the "processing and researching of news." Mr. Hilton is in the business of shaping narratives for clicks and profit, not informing the public. That is not the kind of work the Nevada Shield Law is designed to protect.[22] The Court need not engage in any further analysis if it finds Mr. Hilton cannot avail himself of a privilege reserved for individual working in their capacity as a reporter.

### ii.    If applicable, the Nevada Shield Law should give way.

Notwithstanding the language of the statute itself, the Supreme Court of Nevada in *Diaz* held that "although the news shield statute provides an absolute privilege to reporters engaged in the newsgathering process, ***there may be certain situations***, *e.g.*, when a defendant's countervailing constitutional rights are at issue, ***in which the news shield statute might have to yield so that justice may be served***." 993 P.2d at 59. Ms. Lively is unaware of any binding authority since *Diaz* that limits the holding to *only* criminal cases,[23] and, since *Diaz*, the Nevada Supreme Court has left open the possibility that there may be other such situations. *See, e.g., Aspen Fin. Servs., Inc. v. Eighth Jud. Dist. Ct. of State ex rel. Cnty. of Clark*, 313 P.3d 875, 880 (2013) ("We need not consider whether this case presents such a situation, as Aspen has not identified any particular circumstances that would take this case outside of the usual application of the statute.").

Ms. Lively respectfully submits that the circumstances of this case create a situation where the Nevada News Shield should "yield so that justice may be served." As discussed above, the material sought by the Subpoena is highly material and relevant. Ms. Lively is entitled to redress

---

[22] As an influencer, Mr. Hilton acts more akin to an advertiser whose role is to promote (not report) and who government agencies and courts have required to disclose their lack of independence. *See, e.g.,* FTC's Guides Concerning the Use of Endorsements and Testimonials in Advertising, 16 C.F.R. 255 (2023) (treating influencers as advertisers, imposing disclosure requirements because their content is commercial in nature); *Sava v. 21St Century Spirits, LLC*, No. 22 C 6083, 2024 WL 3161625, at *13 (N.D. Ill. June 25, 2024) (finding influencers who failed to disclose paid relationships could mislead consumers by presenting themselves as disinterested parties); *Ariix, LLC v. NutriSearch Corp.*, 985 F.3d 1107, 1116–19 (9th Cir. 2021) (even speech that does not resemble traditional advertising may qualify as commercial speech if motivated by financial gain).
[23] Non-binding authority that holds that criminal cases are the only ones in which the Nevada Shield Law would yield cite only *Diaz* for the proposition and do not reconcile that holding with the express language of *Diaz* suggesting a constitutional right *as one example* of where the Nevada Shield Law *might* yield. *See, e.g., Finn v. City of Boulder City,* No. 2:14-cv-01835-JAD-GWF, 2017 WL 11682320, at *3 (D. Nev. Dec. 20, 2017).

OPPOSITION TO THIRD-PARTY PEREZ HILTON'S MOTION TO QUASH AND CROSS-MOTION TO COMPEL

injuries caused by the retaliatory and defamatory conduct of the Wayfarer Parties and the information in Mr. Hilton's possession is critical to Ms. Lively's due and proper preparation for trial, and the exclusion of such evidence would deprive Ms. Lively of necessary information to establish the "untraceable" and unlawful campaign of retaliation the Wayfarer Parties have waged against Ms. Lively through their host of (even unwitting) content creators. Additionally, Ms. Lively has been attempting to obtain the Wayfarer Defendants' communications with content creators such as Mr. Hilton for nearly six months. *Supra* at 6–8. The Wayfarer Defendants have, at every turn, refused to provide such information voluntarily and insisted that Ms. Lively expend considerable resources fighting objections and litigating her entitlement to these communications. To date, Ms. Lively has received virtually no communications with content creators, and none with Mr. Hilton despite the fact that neither Mr. Hilton nor the Wayfarer Defendants have denied their existence. While Ms. Lively has filed a motion to compel the production of such information, time is running low. Under these circumstances, especially given Mr. Hilton's lack of independence, the Court should not permit Mr. Hilton to shield his communications.

2. <u>The requested documents are not protected by Attorney-Client Privilege</u>.

Mr. Hilton asserts that the Subpoena "threatens to pierce of veil of attorney-client privilege" (Mot. at 10–11, 13), but speculative harm fails to provide a basis to quash. *See Wells Fargo Bank, N.A. v. ANC Vista I, LLC*, No. 2:14-CV-00840-JCM, 2015 WL 557069, at *3 (D. Nev. Feb. 11, 2015) ("The Court will not make a ruling based on speculation as to various documents" that may exist). Nor is there any basis to find that any of the requested materials even threaten to impose on the attorney-client privilege. "Under Nevada law, the attorney-client privilege applies to confidential communications between an attorney and client made for the purpose of facilitating the rendition of professional legal services." *Nguyen v. Shelter Mut. Ins. Co.*, No. 2:24-CV-00014-CDS-BNW, 2025 WL 343174, at *2 (D. Nev. Jan. 29, 2025). Mr. Hilton has insisted, repeatedly, that he is proceeding *pro se* and that Mr. Freedman is not serving as his counsel with respect to the Subpoena, and that Mr. Hilton has nothing to do with the Underlying Litigation or the underlying events at issue in it. *See* Mot. at 2, 11. Notwithstanding those

representations, Mr. Hilton seems to suggest that because of his *former* attorney-client relationship with Mr. Freedman, any communications between the two or between Mr. Hilton and "members of" Mr. Freedman's firm about *this litigation* would be privileged. None of Mr. Hilton's arguments for wholesale nondisclosure passes muster. As a threshold matter, the proper procedure for challenging the Subpoena for privilege is not a motion to quash Ms. Lively's requests. *See* Fed. R. Civ. P. 26(b)(5); *see also Apple Inc. v. Samsung Elecs. Co.*, 306 F.R.D. 234, 239 (N.D. Cal. 2015) (explaining that "[t]he Ninth Circuit is clear: a party cannot withhold documents as privileged if it fails to substantiate its privilege assertions" and "[a] privilege log" might serve such purpose). Mr. Hilton should therefore be required to produce a privilege log that Ms. Lively may in turn challenge. And even if any privilege *were* to apply, communications with "members of" Mr. Freedman's firm would not be privileged, as Mr. Hilton makes no plausible argument that he has an attorney-client relationship with anyone but Mr. Freedman. *See* Mot. at 11. On the merits, Mr. Hilton's contentions are specious because he has not argued that he engaged in communications for legal advice. *Phillips v. C.R. Bard, Inc.*, 290 F.R.D. 615, 647 (D. Nev. 2013) (requiring production where "the primary purpose of this communication was not to obtain legal advice"); *Roche Freedman LLP v. Cyrulnik*, No. 21-CV-01746-JGK-SN, 2022 WL 17979801, at *1 (S.D.N.Y. Dec. 28, 2022) ("When an attorney is consulted in a capacity other than as a lawyer, as (for example) a policy advisor, media expert, business consultant, banker, referee or friend, that consultation is not privileged.") (quoting *In re Cnty. Of Erie*, 473 F.3d 413, 421 (2d Cir. 2007)); *see also* 1 McCormick On Evid. § 88 (9th ed. 2025) (same); *United States v. Chen*, 99 F.3d 1495, 1501 (9th Cir. 1996) ("That a person is a lawyer does not, *ipso facto*, make all communications with that person privileged.").[24] For good reason—any argument that Mr. Hilton communicated with Mr. Freedman to procure legal advice would be fatal to his claim that he gathered the information for purposes of "reporting." To the extent Mr. Hilton has communications with Mr.

---

[24] Mr. Hilton refers to a "potential ethical conflict" in his Motion (Mot. at 11), but the existence of an ethical conflict does not provide a basis to quash the Subpoena, and further strengthens the notion that Mr. Freedman does not represent Mr. Hilton with respect to this litigation.

OPPOSITION TO THIRD-PARTY PEREZ HILTON'S MOTION TO QUASH AND
CROSS-MOTION TO COMPEL

1    Freedman or members of his law firm about Ms. Lively, they are not protected by the attorney-

2    client privilege and he must produce them.

3        C.    **The Subpoena Is Procedurally Valid.**

4        Mr. Hilton argues that the Subpoena is procedurally invalid because it was "issued from

5    the Southern District of New York but seeks compliance in Nevada" where Ms. Hilton states he

6    lives and works. Mot. at 6. Not so. Rule 45 expressly *requires* third-party subpoenas to be issued

7    from the court with jurisdiction over the underlying litigation and command compliance "at a place

8    within 100 miles of where the person resides, is employed, or regularly transactions business in

9    person." *See* Fed R. Civ. P. 45(a)(2), (c)(2)(A); *see Argento*, 2015 WL 4918065, at *3 (Rules

10   "provide that subpoenas are issued from the court where the action is pending, while motion

11   practice arising out of those subpoenas is decided by the court where compliance is required absent

12   that court transferring the matter to the court where the action is pending").

13       D.    **Nevada's Anti-SLAPP Law Does Not Provide A Basis To Quash.**

14       Mr. Hilton acknowledges that Nevada's Anti-SLAPP Law "does not explicitly apply to

15   subpoenas" and fails to provide basis (or even ask) for the Court to make new law applying it to a

16   motion to quash. *See* Mot. at 12–13. On its face, Nevada's Anti-SLAPP Law authorizes the filing

17   of a motion to dismiss a "civil action" and ***only*** when a civil action is "***based*** on a communication

18   in furtherance of the right to petition or the right to free speech in direct connection with an issue

19   of public concern" and was made in "good faith." Nev. Rev. Stat. Ann. §§ 41.660 & 41.650. The

20   Nevada Supreme Court has held that the Nevada Ani-SLAPP Law does not apply "to 'any act

21   having any connection, however remote, with a judicial proceeding.'" *Patin v. Ton Vinh Lee*, 429

22   P.3d 1248, 1251–52 (2018) (cleaned up) (citations omitted).[25] Even if Nevada's Anti-SLAPP law

23   were to apply to motions to quash, it would not warrant doing so here where Mr. Hilton has not

24

25   [25] It appears to be an open question whether the Ninth Circuit would find Nevada's Anti-SLAPP
     statute applicable in federal court even in the context of a motion to dismiss, let alone as a vehicle
26   to quash a subpoena issued pursuant to the Federal Rules. *See Sternberg v. Warneck,* No. 2:23-
     CV-01466-APG-EJY, 2025 WL 1489701, at *3 (D. Nev. May 22, 2025) (opining that Nevada's
27   Anti-SLAPP Law "collides with the Federal Rules related to discovery" and remarking that the
     Ninth Circuit "would almost certainly" apply its ruling that "the discovery rules in California's
28   anti-SLAPP law do not apply in federal court" to Nevada's law).

demonstrated his statements about Ms. Lively were made in good faith. *See Wilgar v. OPM Las Vegas Corp.*, No. 2:19-CV-1036-RFB-EJY, 2020 WL 1433523, at *6 (D. Nev. Mar. 23, 2020) (denying motion to dismiss pursuant to Nevada Anti-SLAPP law where both sides "vociferously dispute whether the complaint was truthful or made without knowledge of its falsehood").

### E.   Mr. Hilton's Trade Secret Concerns Do Not Provide A Basis To Quash.

Mr. Hilton claims that the Subpoena seeks "commercially sensitive" materials because he owns and operates "a media website with editorial discretion and proprietary decision-marking processes." Mot. at 14. The Subpoena does not request any discovery into his editorial process, and Mr. Hilton does not sufficiently explain how his communications and agreements with the Wayfarer Parties "constitute 'a trade secret or other confidential research, development, or commercial information.'" *GW Grundbesitz AG v. Gunn*, No. 2:21-cv-02074-CDS-NJK, 2022 WL 4359131, at *2 n.3 (D. Nev. Sept. 20, 2022) (court "need not address undeveloped arguments" (citations omitted)); *see* Ex. A; *Banq*, 2025 WL 1938754, at *3. As this Court has recognized, any privacy concerns are appropriately alleviated by a protective order rather than wholesale quashing. *Banq*, 2025 WL 1938754, at *3. Thus, even if Mr. Hilton could substantiate his trade-secrets claim, any documents produced in response to the Subpoena would be allowed the robust protections of the Underlying Litigation's Protective Order. *See* Underlying Litigation, ECF No. 125.

### F.   There Is No Basis For The Court To Award Fees Or Enter Sanctions.

Mr. Hilton's demand for attorney's fees under Rule 45(d)(1) fails because "absent undue burden imposed by an oppressive subpoena, a facially defective subpoena, or bad faith on the part of the requesting party, Rule 45(c)(1) sanctions are inappropriate." *Mount Hope Church v. Bash Back!*, 705 F.3d 418, 429–30 (9th Cir. 2012) ("Sanctions for issuing a subpoena are in no way supported merely because a party advocated a position in seeking discovery that lost in the end.");[26] *Bd. of Trs. of S. Nevada Joint Mgmt. & Culinary & Bartenders Training Fund v. Fava*, No. 2:18-cv-00036-JCM-DJA, 2019 WL 11093817, at *3 (D. Nev. Oct. 31, 2019) (Albregts, J.) (declining sanctions because "the Court does not find that Plaintiff acted in bad faith in issuing the

---

[26] By contrast, Rule 37 mandates fee shifting when a motion to compel is granted, which would apply here if the Court grants Ms. Lively's cross-motion to compel. *See* Fed. R. Civ. P. 37(a)(5).

OPPOSITION TO THIRD-PARTY PEREZ HILTON'S MOTION TO QUASH AND CROSS-MOTION TO COMPEL

subpoena").[27] Mr. Hilton has provided no facts demonstrating that Ms. Lively issued the subpoenas for an improper purpose as opposed to securing responsive discovery that no one disputes exists.

Mr. Hilton's request that the Court sanction Ms. Lively's counsel pursuant to Rules 26(g) and 11 is meritless for the same reason. *See* Mot. at 18–20; *see Mount Hope*, 705 F.3d at 425 ("Because Rule 45(c)(1) gives 'specific application' to Rule 26(g), it follows that a violation of any one of the Rule 26 duties will be relevant to assessing propriety of sanctions under Rule 45(c)(1)'s 'undue burden' language.").[28] For sanctions, Mr. Hilton merely recycles the same failed arguments. *See* Mot. at 20 (asking for sanctions because Subpoena "targets a non-party journalist," "seeks privileged" materials, causes undue burden, is overbroad, and suffers from procedural deficiencies).[29] The Court should deny Mr. Hilton's demands for fees and sanctions.

## III.    IF THE COURT DENIES THE MOTION, IT SHOULD COMPEL MR. HILTON TO RESPOND TO AND PRODUCE MATERIALS RESPONSIVE TO THE SUBPOENA.

Ms. Lively respectfully requests that the Court compel Mr. Hilton to respond to the subpoena in full within seven days of entry of an order. For the reasons discussed above, all the arguments advanced by Mr. Hilton (and therefore the sole objections preserved) fail. Accordingly, Mr. Hilton must produce all material responsive to the Subpoena other than those subject to another applicable privilege and, as to any withheld materials, a privilege log that complies with the Federal Rules. In the event the Court grants Ms. Lively's cross-motion to compel, it should order Mr. Hilton to pay the attorney fees required to compel such discovery. *See* Fed. R. Civ. P. 37(a)(5).

---

[27] Mr. Hilton cites *Mount Hope* as "reversing denial of sanctions," but that is demonstrably wrong. *Compare* Mot. at 18, *with Mount Hope*, 705 F.3d at 429–30. The Ninth Circuit "reverse[d] the sanctions imposed [], which we think would have the effect of chilling valuable advocacy" by awarding sanctions simply for advocating a position with which a court disagrees. *Id.*

[28] In addition to providing no basis for Rule 11 sanctions, Mr. Hilton has failed to comply with its 21-day requirement. *See* Fed. R. Civ. P. 11 (c)(2).

1

2                                                    Respectfully submitted,

3     Dated: August 18, 2025                          /s/ *Richard J. Pocker*

4
                                                      BOIES SCHILLER FLEXNER LLP
5     WILLKIE FARR & GALLAGHER LLP                    Richard J. Pocker (NV Bar No. 3568)
      Michael J. Gottlieb (*pro hac vice* forthcoming)  300 South Fourth Street, Suite 800
6     Kristin E. Bender                               Las Vegas, NV 89101
7     1875 K Street NW                                (702) 382-7300
      Washington, DC 20006                            rpocker@bsfllp.com
8     (202) 303-1000
      mgottlieb@willkie.com                           BOIES SCHILLER FLEXNER LLP
9     kbender@willkie.com                             Sigrid S. McCawley
                                                      401 E. Las Olas Blvd., Suite 1200
10    Aaron E. Nathan                                 Ft. Lauderdale, FL 33301
11    787 Seventh Avenue                              (954) 356- 0011
      New York, NY 10019                              smccawley@bsfllp.com
12    (212) 728-8904
      anathan@willkie.com                             MANATT, PHELPS & PHILLIPS LLP
13                                                    Esra A. Hudson (*pro hac vice* forthcoming)
      DUNN ISAACSON RHEE LLP                          Stephanie A. Roeser (*pro hac vice* forthcoming)
14    Meryl C. Governski (*pro hac vice* forthcoming)  Sarah Moses
15    401 Ninth Street, NW                            2049 Century Park East, Suite 1700
      Washington, DC 20004                            Los Angeles, California 90067
16    (202) 240-2900                                  (310) 312-4000
      mgovernski@dirllp.com                           ehudson@manatt.com
17                                                    sroeser@manatt.com
                                                      smoses@manatt.com
18
                                                      Matthew F. Bruno
19                                                    7 Times Square
20                                                    New York, NY 10036
                                                      (212) 790-4525
21                                                    mbruno@manatt.com

22

23

24

25

26

27

28

OPPOSITION TO THIRD-PARTY PEREZ HILTON'S MOTION TO QUASH AND
CROSS-MOTION TO COMPEL

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that the foregoing Opposition to Third-Party Perez Hilton's Motion to Quash and Cross Motion to Compel was served on August 18, 2025 via the Court's CM/ECF electronic filing system addressed to all parties on the e-service list and mailed to Mr. Hilton's mailing address of record.

                    /s/ *Richard J. Pocker*
                    Richard J. Pocker