—2:25-cv-01396-RFB-DJA—

1            UNITED STATES DISTRICT COURT

2                DISTRICT OF NEVADA

3

4                          )
   In Re Subpoena to:      )  Case No. 2:25-cv-01396-RFB-DJA
5                          )
                           )  Las Vegas, Nevada
6  MARIO LAVANDEIRA, JR.   )  Tuesday, September 2, 2025
   aka PEREZ HILTON,       )  2:14 p.m.
7                          )
                           )  MOTION HEARING
8  _____)
                           )  *C E R T I F I E D   C O P Y*
9

10

11

12

13        REPORTER'S TRANSCRIPT OF PROCEEDINGS

14      THE HONORABLE RICHARD F. BOULWARE, II,
            UNITED STATES DISTRICT JUDGE

15

16

17

18  APPEARANCES:      See next page

19

20

21

   COURT REPORTER:    Patricia L. Ganci, RMR, CRR
22                     United States District Court
                       333 Las Vegas Boulevard South, Room 1334
23                     Las Vegas, Nevada  89101

24  Proceedings reported by machine shorthand, transcript produced
   by computer-aided transcription.
25

─2:25-cv-01396-RFB-DJA─

1  APPEARANCES:

2  For the Third Party:

3       **MARIO LAVANDEIRA, JR.**
         PRO SE
4        Ph@perezhilton.com

5  For the Respondents:

6       **RICHARD J. POCKER, ESQ.**
         BOIES SCHILLER & FLEXNER, LLP
7        300 South Fourth Street, Suite 800
         Las Vegas, Nevada 89101
8        (702) 382-7300

9        and

10      **MERYL C. GOVERNSKI, ESQ.**
         BOIES SCHILLER & FLEXNER, LLP
11       5301 Wisconsin Avenue NW
         Washington, DC 20015
12       (202) 237-2727

13

14

15

16

17

18

19

20

21

22

23

24

25

2:25-cv-01396-RFB-DJA

1          LAS VEGAS, NEVADA; TUESDAY, SEPTEMBER 2, 2025; 2:14 P.M.

2                              --oOo--

3                     P R O C E E D I N G S

4          THE COURT:  Please be seated.

5          COURTROOM ADMINISTRATOR:  This is the time set for a

6  motion to quash.  Calling case 2:25-cv-1396-RFB-DJA, In Re:

7  Mario Lavandeira, Jr.  Counsel, please make your appearances for

8  the record.

9          MR. LAVANDEIRA:  My name is Mario Lavandeira,

10 professionally known as Perez Hilton.  The Court, if you would

11 like, can refer to me as Mr. Hilton.  And I am representing

12 myself pro se.

13         THE COURT:  Okay.

14         MS. GOVERNSKI:  Good morning, Your Honor.  Meryl

15 Governski of Dunn Isaacson Rhee, along with my colleague, Rick

16 Pocker -- go ahead, Rick.  Rick Pocker from Boies Schiller &

17 Flexner.

18         THE COURT:  Good morning.  So let me deal with a few

19 preliminary matters here which I think are important.

20         First, in reviewing the submissions of the parties and

21 the law as it relates to this case, the Court does find under

22 Federal Rule of Evidence 501 that federal common law generally

23 applies here because there are federal questions and claims at

24 issue here.  What that means is, counsel and Mr. Hilton, that

25 the qualified reporter's privilege, which is the federal

─2:25-cv-01396-RFB-DJA─

1  common-law privilege, is the one that would potentially be

2  applicable here.  So state privileges under Nevada law would not

3  be applicable to the motion to quash in this case, and that will

4  be the finding of the court.

5        Now, the qualified reporter's privilege has its own

6  requirements here in the circuit and in other circuits which the

7  court will consider, but in looking at the privilege there are

8  certain factors that the court has to consider.  This relates to

9  the availability of the information from other sources, whether

10  or not it's duplicative or cumulative or not, and its relevance

11  to the issue at hand.

12        So, I want to start with a discussion of the privilege,

13  and I want to start with counsel for the respondents.  And,

14  Ms. Governski, if you could come up to the podium, please.

15        MS. GOVERNSKI:  Good afternoon, Your Honor.

16        THE COURT:  Good afternoon.

17        So as I understand it, Ms. Governski, Judge Liman has

18  ordered production of certain communications, right, regarding

19  the defendant's contact with influencers such as Mr. Hilton

20  here.  Now, I was trying to figure out whether or not Judge

21  Liman issued a deadline for the production of that material.

22  One of the factors that the court has to consider is the

23  duplicative nature of production.  There is an existing order

24  that it seems to me covers at least some of what is being sought

25  in this subpoena.  So if you give me your perspective of what

─2:25-cv-01396-RFB-DJA─

 1  you understand to be the timeline for that and the scope of

 2  that.

 3        And, Mr. Hilton, to the extent that you have

 4  information, I'll ask you the same question.

 5        But, Ms. Governski, since you're involved with that

 6  litigation as well, I wanted to ask you that question first.

 7        MS. GOVERNSKI:  Your Honor, I have to double-check the

 8  exact date.  I believe it's either September 5th or September

 9  8th that he -- that he ordered the production of those

10  materials.  I just wanted to point out, though, Your Honor, as

11  you mentioned, that there may not be actual overlap, and

12  actually the fact that the materials themselves may be in

13  Mr. Hilton's possession is independently probative separate from

14  the fact that they may also be in the possession of some of the

15  other individuals.

16        So, first of all, we don't know at this point whether,

17  for instance, as we mentioned in our supplemental filing, they

18  had oral conversations, they had phone conversations, there were

19  things that were physically communicated or provided to them.

20  One of our requests calls for any talking points or materials

21  that were delivered via a share drive because we have uncovered

22  information that indicates that one of the ways that the

23  Wayfarer defendants or their agents were providing materials to

24  content creators was through, like, a share drive that other

25  people had passwords to.  And so the fact that he had those

—2:25-cv-01396-RFB-DJA—

1  materials in his possession would be something we could not

2  receive from anywhere else.  Even if you can receive the

3  underlying materials from, say, the Wayfarer defendants, the

4  fact that he would have them in his possession is also

5  probative.

6           We also asked for agreements.  We asked for payments.

7  We asked for things --

8           THE COURT:  So, Ms. Governski --

9           MS. GOVERNSKI:  Yeah.

10          THE COURT:  -- I'm aware of the ways in which the

11 production asks for materials that don't duplicate.

12          MS. GOVERNSKI:  Correct.

13          THE COURT:  I am focussed on the duplication because

14 what you're describing you've actually written also in various

15 filings, but I wanted to get the date for the production and

16 whether or not any materials have been provided thus far.

17          MS. GOVERNSKI:  No, no materials have been provided

18 thus far.  And I should note, Your Honor, that as we also noted

19 in our filing, but I think is worth emphasizing here, one of the

20 defendants has already acknowledged that he does not possess

21 Signal communications because he had auto-delete on.  And the

22 Wayfarer defendants have not produced a single Signal

23 communication despite our specifically requesting them,

24 including their communications with content providers.  And some

25 of the individuals have admitted to using Signal to having

—2:25-cv-01396-RFB-DJA—

1   conversations with content creators, which we allege was

2   directly part of the retaliation campaign.

3          So I am not -- we don't know what we will get, if we're

4   going to end up in the same situation as we were in with one of

5   the defendants where the court says, "He says doesn't have them,

6   so he doesn't have them."

7          THE COURT:  Okay.

8          In the other case did Judge Liman or have the Wayfarer

9   defendants provided a privilege log as relates to any privileged

10  communications?

11         MS. GOVERNSKI:  They have provided a privilege log

12  which is deficient and does not include a number --

13         THE COURT:  Okay.  I'll get to the -- let's separate

14  the legal arguments.  But have they provided it and what's in

15  the log thus far?

16         MS. GOVERNSKI:  Yeah, what we're saying is the log thus

17  far has a single communication with a single content provider.

18  It does -- and one of the things that the court moved to compel

19  was logging additional communications with counsel for the

20  Wayfarer defendants because we understand that some of the

21  communication may have happened via their counsel.

22         THE COURT:  Right.  So they're represented, right, in

23  that court?  The Wayfarer defendants are represented by counsel?

24         MS. GOVERNSKI:  They are represented by counsel who --

25         THE COURT:  And counsel provided a privilege log with

—2:25-cv-01396-RFB-DJA—

1    one entry in it?

2          MS. GOVERNSKI:  Counsel did not provide a privilege log

3    for -- the Wayfarer parties provided a privilege log with one

4    entry with a content provider.  And it did not include a number

5    of communications that we are aware of between their counsel and

6    other individuals.  We've in fact received -- it's a very

7    complicated, convoluted set of discovery in New York, but we

8    also have moved to compel certain third parties who have

9    provided more robust privilege logs that do indicate some

10    communications that are not logged on the other privilege logs.

11          THE COURT:  Okay.

12          MS. GOVERNSKI:  Yeah.  So that also is currently in the

13    process of being litigated, but I will tell you, I'll have to

14    confirm, but I'm 90 percent sure that no communications with

15    Mr. Hilton is logged on any privilege log.

16          THE COURT:  Okay.  Because one of the first steps it

17    seems to me that the court would have to undertake in this case

18    would be the potential ordering of a privilege log from

19    Mr. Hilton to identify what communications exist and the nature

20    of them.

21          Now, I will tell you in the context of considering

22    that, because of the nature of the privilege, I would consider

23    it be provided first just to the court in camera so that I could

24    then evaluate after the September 5th or 6th deadline had past

25    whether or not there's any duplicative material.  Because if

—2:25-cv-01396-RFB-DJA—

1  there is some, obviously the court can address that.  If there's

2  none, then the court can address that as well.

3      Is there any reason that we could not proceed in that

4  fashion with the first step being the privilege logs so the

5  court can consider the factors it's required to consider as it

6  relates to the production potentially of the material and then

7  comparing whatever is on the log to what has been or has not

8  been produced pursuant to Judge Liman's order?  And then the

9  Court can consider arguments after that about what should be

10  produced.  Any reason why we cannot proceed in that fashion?

11      MS. GOVERNSKI:  Well, I have two points where I think

12  it may caution against it, although that is certainly better

13  than the alternative of -- of the status quo where we are now

14  with having no insight into what these materials are, first is

15  just the timeline.  Document discovery is closed.  Depositions

16  are underway.  And, you know, the amount of time delay is -- is

17  prejudicial.  And the reason we're here this late is because

18  we've tried to do everything we can to exhaust this to get this

19  from the parties for months, more than six months.

20      And so more delay only benefits the, kind of, shell

21  game that we are now finding ourselves with everyone pointing

22  fingers at everyone else and no one actually producing materials

23  from us.

24      So delay really does hurt us, and it hurts, you know,

25  the -- the very rigid schedule that Judge Liman has set out.  So

———2:25-cv-01396-RFB-DJA———

1  that's my number one point.

2      My number two is your question presupposes that the

3  privilege would attach.  And I think there's a real question

4  about whether the privilege will -- would attach here because,

5  you know, we have sworn interrogatories that Mr. Hilton was one

6  of the content providers who seeded, generated, produced,

7  offered his services on behalf of the Wayfarer defendants.  That

8  is not the role of an independent journalist.  That is not the

9  type --

10      THE COURT:  But that fact is in dispute, Ms. Governski.

11  I appreciate that that's the position you've taken.  I see that.

12  You've argued that to me.

13      The question still remains for me to determine how to

14  apply the privilege.  And it seems that in various cases,

15  including in this circuit, the courts direct the District Court

16  to engage in a very specific, fact-specific, case-specific

17  inquiry.  Now, when it comes to privileged materials, as you

18  know, you can't categorically or blanketly invoke the privilege.

19  On the other hand, I can't categorically deny it either.

20      And so while I understand your argument that you think

21  it may not apply at all, I don't know that on this record that I

22  can find and I don't think that I could find that it doesn't

23  apply categorically.  And I think when the record represents

24  what it does here, the prudent approach is to look at the

25  privilege log and make a determination, communication by

─────2:25-cv-01396-RFB-DJA─────

1    communication, which is typically how we apply privileges.

2            And while I can appreciate the issue of the time, I can

3    only deal with the case as it's come to me in the time that it

4    came to me, but I am not unmindful of that.  So thank you.

5            MS. GOVERNSKI:  Can I just say one more thing, Your

6    Honor, please?

7            THE COURT:  Sure.

8            MS. GOVERNSKI:  I would just note, as you indicated,

9    the -- the format and the content of the privilege log is

10    incredibly important here.  There's been some dispute about the

11    timeframe, you know, the -- I would ask that Your Honor consider

12    the court's order in the motion to compel that materials

13    through, I believe it was, February 21st, 2025, is the relevant

14    end date.  I, you know --

15            THE COURT:  I'm not sure that I'm going to put an end

16    date on mine.

17            MS. GOVERNSKI:  That's fine, but I would just ask that

18    it not -- what I'm nervous about is that we get a -- we get a

19    privilege log, which we've received similar ones from certain

20    third parties, that lump lots of communications together, don't

21    separate out text messages, don't include the tos or the froms,

22    don't include the dates, you know.

23            THE COURT:  I will give specific instructions --

24            MS. GOVERNSKI:  Perfect.

25            THE COURT:  -- as it relates to that, but I want to

—2:25-cv-01396-RFB-DJA—

1  hear Mr. Hilton on the issue of the privilege log itself.

2          MS. GOVERNSKI:  I appreciate your time.  Thank you.

3          THE COURT:  Thank you.

4          Mr. Hilton, if you'd come up to the podium, please.

5          So, Mr. Hilton, I'll give you an opportunity to argue

6  as to why the court would not order the production of a

7  privilege log.  As you're representing yourself and are not a

8  lawyer and may not be familiar with it, typically when a party's

9  invoking the privilege, a log of the communications or documents

10 to be covered has to be created so the opposing party can review

11 that.

12         Now, in this case because the privilege also covers

13 potentially sources, I wouldn't order that you produce it to the

14 respondents, but in order for the court to determine whether the

15 privilege actually applies, I need to see the types of

16 communications for which you are asserting it.

17         So, I'll give you an opportunity to be able to respond

18 to that.  But it would be my intention to order you to provide a

19 privilege log that would not be provided to the respondents, but

20 that would then allow the court to be able to consider your

21 arguments specifically as to each communication whether the

22 privilege applies.  So if you would like to respond, you may.

23         MR. LAVANDEIRA:  Thank you, Your Honor.  First, for the

24 record, I would like to assert that, as Ms. Lively's counsel

25 told this court last week, in New York Ms. Lively asserted

—2:25-cv-01396-RFB-DJA—

1  California law should be applied.

2          THE COURT:  Okay, Mr. Hilton.  The court has already

3  decided that.  I don't want to go over decisions I've already

4  rendered.

5          THE DEFENDANT:  Okay.

6          THE COURT:  You've actually asserted your position.

7  I've decided --

8          MR. LAVANDEIRA:  Okay.

9          THE COURT:  -- that federal common law applies.  So I

10 want you to focus on the questions --

11         MR. LAVANDEIRA:  Sure.

12         THE COURT:  -- that I'm asking you because I appreciate

13 you've made that record.  The record exists.  But --

14         MR. LAVANDEIRA:  Okay.

15         THE COURT:  -- in my review of the law --

16         MR. LAVANDEIRA:  I would also --

17         THE COURT:  Hold on.

18         MR. LAVANDEIRA:  Sorry.

19         THE COURT:  -- federal common law applies.  So I want

20 you to focus on the specific question.

21         MR. LAVANDEIRA:  Yes.

22         THE COURT:  And then after that if you think something

23 needs to be addressed that you haven't put in your papers, you

24 can.  But you've certainly in your papers identified arguments

25 you think the court should consider as it relates to what

─────2:25-cv-01396-RFB-DJA─────

1  privilege applies and what law applies.  I've considered them

2  and made my decision about that.  So you don't need to repeat

3  those here, but you haven't heard me discuss the issue of the

4  privilege log which is why I want to ask you that question.

5          MR. LAVANDEIRA:  Yes.

6          Well, I would also just like to in the spirit of

7  camaraderie echo what Ms. Lively's lawyers said.  I absolutely

8  am in agreement that I would love for this to be resolved today

9  or as soon as possible.  So just in accordance there.

10          I've tried to do everything that this court has asked

11  of me, Your Honor, and on Friday I was given the instructions to

12  create a privilege log.  So I have already done that, which I am

13  prepared to go over with you in camera.

14          THE COURT:  Okay.  Well, I appreciate the work that

15  you've put in, Mr. Hilton, because I do think, first, under the

16  law and under your invocation of the privilege, the court is and

17  will order the production and creation of a privilege log.  As

18  I've said, I've considered the arguments and I think under

19  federal common law the qualified reporter's privilege would

20  apply.  And in the invocation of any privilege, actually, you

21  still have to produce a privilege log for the court to make that

22  determination.

23          And, again, it would be my approach in this case would

24  be for you to provide it to me.  And if you wanted to do this

25  today, we could essentially clear the courtroom and go over the

—2:25-cv-01396-RFB-DJA—

1  log together on an ex parte basis to make a determination.

2       I assume, Ms. Governski, you would not object to that

3  since you're concerned with, sort of, expedited review, but if

4  we have the privilege log and I can ask Mr. Hilton questions

5  about it, that would certainly expedite the process, would it

6  not?

7       MS. GOVERNSKI:  I agree.  Off the top of my head, I

8  can't think of any reason I object, but I'd just like to reserve

9  the right to think about the ex parte nature of it -- of the --

10      THE COURT:  Well, I don't know how else -- if I have

11 questions about the log, right, that's where I would ask them.

12 So the ex parte nature would be about what's in it, right, and

13 clarifying that, right.  So I'm not going to ask him about

14 anything else, but to the extent that the privilege might apply,

15 right, he's entitled for me to consider that before I would

16 divulge information about the log.

17      If it turns out that I think it's not privileged, he's

18 also potentially entitled to be able to challenge that and to

19 address that with me without divulging what's in the privilege,

20 right.  And so I want to be clear, the ex parte aspect of this

21 would be just about a conversation about the log itself, whether

22 it's sufficient or not, whether there are any deficiencies,

23 right, and if there's a description, what that description may

24 mean if it's sufficient for me to make the determination.

25      It's hard for me to imagine that that would not be the

—2:25-cv-01396-RFB-DJA—

1  appropriate approach.  That's actually the way we deal with

2  privilege logs, as you know, all the time.  Where a court has a

3  question about a privilege log, the court doesn't have both

4  parties in the hearing when that happens.

5      So I just want to be clear, it's nothing more than

6  questions about the privilege log before the court makes that

7  determination.  Now, I may decide, again, that what should be

8  discussed should be discussed in open court, but I don't see how

9  the privilege is protected if it's done in open court.  So

10 that's why I think we would do it in this fashion.

11     I don't think it would take that long, but I think that

12 if Mr. Hilton already has the privilege log and the court can

13 review it in camera and then can have an ex parte proceeding

14 based upon that, that would certainly expedite the process which

15 is what you had asked for to begin with.

16     MS. GOVERNSKI:  Yeah, I think that makes sense, Your

17 Honor.  I would just ask that if the privilege log itself does

18 not divulge any privileged information and there's a way that

19 you can provide that to both parties, even if the privileged

20 pieces are redacted, I think that would be helpful.  And if

21 there are any -- any objections to a determination of whether

22 something is or is not privileged, I would ask that we would be

23 able to be part of -- you know, it's hard to talk about it in

24 the abstract, but I can imagine that, you know, we argue over --

25 over privilege logs all the time, and the privilege logs

 1  themselves are not -- are not ex parte or --

 2          THE COURT:  But that's -- but the issue here is the

 3  source is also protected, Ms. Governski.

 4          MS. GOVERNSKI:  Well, but --

 5          THE COURT:  You're right.  I mean, in an

 6  attorney-client privilege we typically know who the attorneys

 7  are, but in this case, right, there is potential protection of

 8  sources.  And so that's why, right, the ex parte aspect to this.

 9  Typically in a case where you have attorney-client privilege the

10  attorneys are known, and so there's no issue about who the

11  attorneys are.  The issue is about what the nature of the

12  communication is.

13          In this case, as you know, the privilege protects the

14  source.  So for him to produce a privilege log that includes,

15  like, names and dates would effectively, right, nullify the

16  privilege.

17          MS. GOVERNSKI:  I understand that, Your Honor.  Just a

18  couple points.

19          One, all of our communications ask for the materials

20  provided for him by people we know are the sources, the Wayfarer

21  defendants or their agents.  So it's a little bit different than

22  your traditional reporter privilege where we're really going

23  after the sources.  We know the sources.

24          THE COURT:  But you don't know, Ms. Governski, right,

25  if any other sources may exist, how many communications may or

─────2:25-cv-01396-RFB-DJA─────

 1  may not exist with these entities, and who said they've had

 2  communication with them.  And it may very well turn out, I don't

 3  know, that there are no communications from these entities.  And

 4  so while they may have said that in interrogatory responses, I

 5  haven't seen or heard --

 6         MS. GOVERNSKI:  I understand.

 7         THE COURT:  -- anything from Mr. Hilton so I can't make

 8  any assumptions about that without reviewing that with him.

 9         MS. GOVERNSKI:  I understand that, Your Honor.  And all

10  I would ask is that at some point if you are able to provide us

11  with a log where even the sources are redacted, if you find that

12  not the entire privilege log is subject to a privilege, but

13  maybe it's only the sources, that seems like something that we

14  should be entitled to.

15         THE COURT:  I agree, but I think the first step is

16  reviewing the log.  I'm not saying that I wouldn't do that,

17  Ms. Governski, and I appreciate your input on that because

18  obviously you're aware of the overall aspects of this case that

19  I am not.  But I think the first step is looking at the

20  privilege log.

21         So, Mr. Hilton, do you have the ability to e-mail that

22  or do you have a physical copy?

23         MR. LAVANDEIRA:  I have a physical copy, Your Honor.

24         THE COURT:  Okay.  Do you have it with you?

25         MR. LAVANDEIRA:  Yes, sir.

2:25-cv-01396-RFB-DJA

1          THE COURT:  Okay.  Can you hand this up to my deputy,
2    please.
3          COURTROOM ADMINISTRATOR:  Thank you.
4          (Court conferring with law clerk.)
5          THE COURT:  All right.  So what I'm going to do now is
6    that I'm going to order the courtroom to be cleared.  And then
7    we will start an ex parte conversation, Mr. Hilton, about the
8    privilege log.
9          So I'd ask everyone in the courtroom, including
10   counsel, to step out, please.  And then we will let you know
11   when we're going to reopen to the public.  Thank you.
12         MS. GOVERNSKI:  Your Honor, can I leave my -- our
13   binders and stuff here or should we take them?
14         THE COURT:  You can.  No one else is coming in here to
15   take it.
16         MS. GOVERNSKI:  Thank you.
17         Oh.  And one more thing, Your Honor.
18         THE COURT:  Yes.
19         MS. GOVERNSKI:  I confirmed September 8th is the date
20   for the production.
21         THE COURT:  For the production.  Okay.  Thank you.
22         (Whereupon, the ex parte proceedings were reported, but
23   not transcribed.)
24         THE COURT:  Okay.  We are back on the record here.
25         So, Ms. Governski, a few things I wanted to cover with

————2:25-cv-01396-RFB-DJA————

1   you.  I reviewed the privilege log that I was provided with

2   Mr. Hilton.  The privilege log requires much more detail.  Based

3   upon my conversation with Mr. Hilton, the creation of the log

4   will require a forensic expert and potentially some paralegal

5   assistance.

6        As you're aware, Ms. Governski, if your client wants

7   this information, they're going to have to pay for this.  I have

8   directed Mr. Hilton to provide me with an estimate -- and we'll

9   keep it consistent with Judge Liman's order -- by September 8th,

10  that will be Monday, Mr. Hilton, of the costs of creating the

11  log.  He's going to provide it to me in camera because he'll

12  have to identify where this information exists, which he's not

13  required to disclose at this time, although he may have to

14  later.

15       I have explained and I'm explaining in open court that

16  the fact that things were conducted ex parte today doesn't mean

17  that what is in the log and what was discussed may not at some

18  point later be disclosed if I find the privilege does not apply.

19  However, without the log being detailed in the way that I

20  described, right, there is simply no way for the court to make a

21  determination about the application of the privilege.

22       But it does potentially involve, not surprisingly,

23  because you've also requested this, electronically-stored

24  information as almost all information is now.  And, again, based

25  upon my conversation with Mr. Hilton the volume and nature of

―2:25-cv-01396-RFB-DJA―

1  the analysis will require an expert.  This is not to say that I

2  think that the volume of material that's relevant is high, but

3  it is to say, in order to even identify that, there has to be

4  forensic analysis.

5         So, Ms. Governski, I'll give you an opportunity to

6  respond to that, but I'm sure you're aware of the law that

7  requires your client to pay for that.  And at this point given

8  what Mr. Hilton's described to me I'm not going to require him

9  to pay for that.  He may also need assistance as it relates to

10 the description because what will be required in the log will be

11 the date of the communication, who it's from, who received it,

12 the nature or category of the information, whether it's an

13 e-mail or text or DM, and a short description of the particular

14 item or communication in the log, right.

15        So the court recognizes that Mr. Hilton is a nonparty

16 here and that, again, based upon a conversation with him this

17 would place an undue burden on him to require him to go through

18 all of this.  And so he's going to provide me with estimates.  I

19 will review those estimates.  Then I will provide you with that

20 information under seal, Ms. Governski, and then you can

21 determine whether or not, or your client can, whether or not

22 they want to pay for it.

23        So that will be the first step because I definitely --

24 I think that once that happens then I can go through the log

25 again with Mr. Hilton.  But I simply can't do that without this

───────2:25-cv-01396-RFB-DJA───────

1  next more involved step.

2          Any questions, Ms. Governski?

3          MS. GOVERNSKI:  Yeah.  So I guess I'm a little bit

4  confused.  Obviously understanding the cost would require

5  knowing was this Signal, were these e-mails, were these texts --

6          THE COURT:  No.  Well, I will know that, but you won't

7  know that.  You're right.  I will know that because I'll know --

8  because I need to know whether or not what is revealed even in

9  the estimates would potentially violate the privilege.  That's

10 why you're not necessarily going to get that without me looking

11 at it.

12         Now, once we get the estimates and I make a

13 determination about what the cost will be, you certainly will be

14 permitted to make that determination.  But what -- but if

15 information may be protected, there's certain types of or

16 categories of information you may not know about until I at

17 least look at it.  I'm saying that to you because there can be

18 ways that the privilege, if it applies, right, could be violated

19 by revealing what's been reviewed in terms of the particular

20 hard drive or iCloud or wherever it is or what formats were

21 used, right.  You're not necessarily -- your client isn't

22 necessarily entitled to that information at this point.

23         Now, when we get the estimates back, I will look at

24 that and then I'll make a determination about what information

25 needs to be revealed.  But I don't want to provide information

─────2:25-cv-01396-RFB-DJA─────

1  and order Mr. Hilton to provide information that ultimately may

2  result in the privilege being violated.  So that's not to say

3  that you won't be able to ask questions later, but in the first

4  instance you will not receive a copy of the estimates.

5       MS. GOVERNSKI:  So my question is, are the estimates a

6  cost estimate or are the estimates about the amount of data in

7  each certain repository that he will provide you?  I'm just not

8  certain what estimates he's providing you.

9       THE COURT:  The estimates will be about what needs to

10 be searched and what information needs to be extracted to be

11 responsive --

12      MS. GOVERNSKI:  Got it.

13      THE COURT:  -- to the creation of the privilege log.

14      MS. GOVERNSKI:  It's about the collection then, what

15 would need to be collected.

16      THE COURT:  Yes.  Well --

17      MS.  GOVERNSKI:  By a vendor.

18      THE COURT:  Well, collected and reviewed for the

19 purpose of creating the privilege log.

20      MS. GOVERNSKI:  Right.

21      THE COURT:  So the digital expert and whatever -- if

22 it's a paralegal or whatever legal assistant would work hand in

23 hand.  As you know, the forensic experts, they extract, but they

24 don't always necessarily describe, right.

25      MS. GOVERNSKI:  No.  Yeah, just a manual collection of

─2:25-cv-01396-RFB-DJA─

1   the devices and the cloud and whatever they need to, and then

2   someone else would review it.

3          THE COURT:  No, no, no.  So I'm assuming that what will

4   happen is that the information would be extracted by the

5   forensic or digital expert, right.  Then Mr. Hilton with the

6   potential assistance of another, sort of, paralegal assistant or

7   whatever would then create the log because there's certain

8   aspects of the log that he has to personally participate in that

9   the experts can't actually create.

10         And so I just wanted to explain to you that I've asked

11  him to give me an estimate of that because I believe that the

12  cost of that is something that your client would have to pay for

13  if it's reasonable.  So he's going to be getting three different

14  estimates, right, for each of the type of cost that he's going

15  to be requesting.  Okay?  And so I will receive all of them and

16  review them.  And then I'll make a decision about what would be

17  revealed and what would not be revealed that would still protect

18  the privilege, but still allow your client to make a

19  determination about whether or not or how they wish to pay for

20  the extraction and categorization of the information.

21         MS. GOVERNSKI:  So a few things, Your Honor.  One is of

22  course the way you're describing it is the way we usually

23  prefer, which is do a forensically-sound complete production of

24  a computer and devices.  But that's not the only way to do a

25  production.  And without understanding the volume, it's hard to

———2:25-cv-01396-RFB-DJA———

1  know whether that is the most reasonable from a cost perspective

2  versus him going into his Signal or him going into his text and

3  taking screenshots.  It's hard for me to know that without the

4  volume.

5        THE COURT:  I'm not going to order him to do that,

6  period.  I'm just telling you that now.  I think that that is an

7  undue burden on him to have to go in and take screenshots.  I am

8  not going to order that.  The only way that your client would be

9  entitled to this information and would receive it is for it to

10  be extracted.

11        MS. GOVERNSKI:  Okay.

12        THE COURT:  Because I think given our conversation and

13  the nature and how -- and the volume of this material it's not

14  efficient and it would place an incredible burden on him --

15        MS. GOVERNSKI:  Okay.

16        THE COURT:  -- to do that.

17        MS. GOVERNSKI:  Understood.

18        THE COURT:  I will -- as I said, Ms. Governski, when we

19  get to the point of paying, I will allow you to ask more

20  questions because I'll have more information.

21        MS. GOVERNSKI:  Okay.  The only --

22        THE COURT:  And most likely we may have at some point

23  the experts have some communication or affidavits as they do in

24  a lot of these cases explain what was actually reviewed and how

25  things were extracted.  We're not there yet, obviously.  But as

—2:25-cv-01396-RFB-DJA—

 1  you know, given your experience, that's how this process

 2  typically works.

 3          MS. GOVERNSKI:  Yeah, I mean, certainly there's plenty

 4  of discovery vendors who can do the extraction in a very fast,

 5  efficient way.  I think the review is a different thing that we

 6  would need to discuss.  But, again, we can cross that bridge

 7  when we come to it.

 8          THE COURT:  Well, the reality of it is, Ms. Governski,

 9  again, I'm not even saying that I can identify or even

10  Mr. Hilton can identify squarely all the material that may be

11  relevant.  It may be a very small amount of material that's even

12  relevant for me considering the privilege, but, as you know, in

13  these sorts of case because of the nature of digital information

14  there has to be an extraction even to get to the analysis --

15          MS. GOVERNSKI:  I get it.

16          THE COURT:  -- of what's relevant and applicable.  It

17  could end up being five documents, but, as you know, we first

18  have to do this forensic analysis to even start that process.

19          MS. GOVERNSKI:  Right, you can't apply search terms

20  until you have the universe of the data.

21          THE COURT:  Right.

22          MS. GOVERNSKI:  I get it.  That makes sense, Your

23  Honor.  The other thing is there are certain categories that

24  would not necessarily be conducive to that which are, for

25  example, hard copies of documents, agreements, proof of payments

—2:25-cv-01396-RFB-DJA—

1  or gifts received, including from Mr. Freedman.  Those things I

2  would expect Mr. Hilton would be able to log on a privilege log

3  himself or produce.  I don't understand how payments from

4  sources or agreements with sources could possibly be privileged.

5          THE COURT:  I don't even -- at this point I'm not aware

6  one way or another whether or not such agreements or documents

7  exist.  So we're in the first step of this process,

8  Ms. Governski.  I don't know one way or the other.  But

9  certainly what I will tell you is if there are, quote/unquote,

10  any type of transactions, right -- and, again, at this point I'm

11  not aware one way or another of any -- I would still insist upon

12  an expert extracting it so we didn't have arguments later about

13  how Mr. Hilton went and got his own records, right, from

14  whatever financial institution.  I can't tell you how many

15  situations I have where I have to eventually go ahead and order

16  a custodian to provide them.

17          So the first step is this universe and the extraction

18  and the creation of the log.  That's not the last step, but

19  that's the first step here.

20          MS. GOVERNSKI:  But, Your Honor, like, hard-copy

21  agreements would not be part of an extraction, and extracting

22  his own cloud would not get his bank records.  And we haven't

23  asked for his bank records.  So I just think in some cases the

24  full collection would be more of a burden on Mr. Hilton than

25  simply saying -- if you have evidence of payments to a bank

─────2:25-cv-01396-RFB-DJA─────

1   account and you plan to withhold that for privilege, that needs

2   to be manually logged.  If you have an agreement, that needs to

3   be manually logged.  I just don't feel like it necessarily needs

4   to be all or nothing because that I think would actually create

5   some burden for materials that are not conducive to ESI.

6        THE COURT:  Well, again, Ms. Governski, we're talking

7   about the first step.  I don't have a log.  I'm not even talking

8   about the log.  I'm talking about extracting information to

9   create the log, right.  When it comes to the log itself, right,

10  if you have requests for hard copies or additional things, we

11  can get to that.  That is actually, relatively speaking, in my

12  view easier, right.  The electronic, sort of, extraction is much

13  more complicated, right.  If Mr. Hilton has documents that he

14  thinks should be included on the privilege log and there are

15  physical documents, we can discuss that when the log is created.

16       And so I want to be clear, I have not said to

17  Mr. Hilton that he shouldn't preserve or keep hard documents.

18  If there are physical copies of documents that are potentially

19  responsive where the privilege might apply, Mr. Hilton has to

20  keep those.

21       I'm not worried about that, Ms. Governski, because, you

22  know, particularly given the nature of the log that I've seen

23  thus far, I'm focussed on electronic information --

24       MS. GOVERNSKI:  Understood.

25       THE COURT:  -- ESI, right, electronically-stored

──2:25-cv-01396-RFB-DJA──

1  information.  So I'm not excluding what you're describing, but

2  that to me seems to be something that we can deal with fairly

3  quickly.  Whereas, this electronic extraction, as you know, can

4  take a little bit of time.  Not necessarily the extraction

5  itself, but the details of it and what's being searched and all

6  of that can take time up to the moment they hit the start button

7  and then it's done in, whatever --

8           MS. GOVERNSKI:  Understood.

9           THE COURT:  -- five seconds.  But that's what the

10  process will be.

11           So the only issue then becomes whether we need to come

12  back.  I don't know that we need to come back.  I mean,

13  depending upon what the estimates look like, Ms. Governski, I'm

14  not sure that I will have a follow-up hearing, per se.  I have

15  to look at that.  And because I don't want us to be coming in

16  just to be discussing the costs, but I may have -- we may have

17  to do that.  I just don't know.

18           I mean, if you are requesting that, I suppose we could

19  talk about that, potentially coming back next week, come back

20  here and talk about it to get the process moving.

21           MS. GOVERNSKI:  Your Honor, I would like to do whatever

22  we need to do to get the process moving so --

23           THE COURT:  Well, what's going to happen, though,

24  Ms. Governski, and this relates to the cost is Mr. Hilton

25  provides these costs, I'll look at them, and then I will

—2:25-cv-01396-RFB-DJA—

1  communicate through an order that's a sealed order here's what I

2  think are the reasonable costs related to this, right,

3  potentially picking one of the vendors that Mr. Hilton has

4  identified.  And I would simply order, right, that your clients

5  pay for that because I have to figure -- he has to figure out

6  how they want to be paid, too.  Because they have to be paid

7  with -- in the way they would normally have to be paid, but they

8  technically work for him.  So, unfortunately, I have to be

9  involved in that because obviously there is a bit of a two step

10 that has to happen as relates to the payment and the process

11 overseeing the expert because technically your client is paying,

12 but it's his expert and so we have to work that out.

13        But I don't know that there's a need to have you come

14 back just for us to do that at this point in time.  I will

15 consider that, but I don't think we need to do that.  If when I

16 receive the estimates I think it's necessary, I will let you

17 know, but the whole point of this is to try to move this along

18 as quickly as possible.

19        I think I have seen and you have seen, although

20 Mr. Hilton may not have seen, what these costs estimates look

21 like.  And I think I'll be in a fairly good position to

22 determine whether or not it's reasonable or not.  Of course,

23 I'll give you an opportunity to be able to respond to that, but

24 I don't know that we need to have you fly back simply to say, "I

25 think this is reasonable and we're going to go ahead and pay."

2:25-cv-01396-RFB-DJA

1  So I'll have to think about that, but right now I don't think

2  that's necessary, unless you want to do that.

3          MS. GOVERNSKI:  No, I mean, it's hard to answer in the

4  abstract.  I guess I would just reserve the right to allow our

5  own vendor to do an estimate of cost to assess reasonableness.

6          THE COURT:  Your vendor wouldn't be able to do that

7  because your vendor is not going to have the information, right,

8  and so that's part of the issue, right.  That's part of the

9  difficulty here.  I have to look at it, right, because your

10 vendor's not going to be able to talk to him directly about what

11 they're reviewing or looking at.

12         MS. GOVERNSKI:  But --

13         THE COURT:  And so the issue -- and this is the

14 difficult part, I understand, that your client is going to be

15 in, Ms. Governski, is that I have to look at whether or not the

16 estimate itself includes information that might violate the

17 privilege.  I don't know that.  And so I'd have to be able to

18 figure out a way to be able to communicate that to you in a way

19 that allows you to make a determination about reasonableness

20 that nonetheless wouldn't necessarily violate the privilege.  So

21 without seeing the estimates I don't know that either.

22         So why don't we just leave it for now that you will

23 reserve the right to be able to question the estimates.  I will

24 consider that, and then if we have to come back, we will.  And

25 then I may have to have a further conversation with Mr. Hilton

—2:25-cv-01396-RFB-DJA—

1  about what's privileged about the sources of the information

2  itself, for example, the physical sources or the cloud source or

3  whatever they may be.  I don't know.  I haven't seen the

4  estimates yet.

5         So I understand, Ms. Governski, that you all may be put

6  in a position right now of not knowing whether it's reasonable

7  without looking at the estimates, but I'm in that same position

8  and I'll look at it and see.  Because it may very well be that I

9  think that the estimate itself wouldn't be covered by the

10  privilege and just disclose generally the information.  And I'll

11  ask Mr. Hilton about that because I'm not sure the privilege

12  extends to that, but sometimes experts can be very detailed in

13  their estimate in terms of what's being requested.

14         And so I also think one of the issues that we may have

15  to -- I may have to work or talk to Mr. Hilton about and their

16  experts is, as you may know, search terms and how they're used

17  and how information is extracted can be a really important part

18  of costs.  And so we have to -- we'll have to talk about that,

19  too.

20         Now, typically, for example, you know, the parties

21  would be involved with that.  So the only thing that may be

22  important, Ms. Governski, for you all potentially to do in this

23  case would be to suggest search terms that you think would be

24  appropriate for the experts to use besides the obvious, you

25  know, "Blake Lively," I mean, right.  There may be other terms

—2:25-cv-01396-RFB-DJA—

 1  that you're aware of that I'm not aware of that would be

 2  appropriate.  That potentially actually would be quite helpful

 3  because you've had experience, too, and Mr. Hilton I'm assuming

 4  has not.  And so the use of the terms and how the terms or how

 5  many terms there are, as you know, actually can be the subject

 6  of litigation itself.

 7       MS. GOVERNSKI:  Yes, we would absolutely want to make

 8  sure that the -- that the vendor that is selected is able to

 9  handle Boolean searches, for instances, or those kind of things

10  which will make it less onerous on Mr. Hilton, and are always

11  happy to provide search terms as long as Mr. Hilton also would

12  provide terms that we may just not know about given the nature

13  of how these communications may have been transmitted or how

14  they -- the terms that they use.

15       I just would like to reserve the right, Your Honor, on

16  the point about whether the repositories of information

17  themselves would be protected by any journalist privilege.  I'd

18  just like to reserve the right to challenge that determination

19  or potential determination depending on what you do at --

20       THE COURT:  Well, you'll have the right --

21       MS. GOVERNSKI:  -- into the future.

22       THE COURT:  I'm sorry.  I didn't mean to interrupt you.

23       But you'll have the right to challenge all of that.

24  I'm just saying to you that the reason why I'm not going to give

25  you the estimates outright is I want to look at them first to

2:25-cv-01396-RFB-DJA

1  make the determination.

2          MS. GOVERNSKI:  I understand.

3          THE COURT:  Because I'm asking Mr. Hilton to provide as

4  detailed an estimate as possible for reasonableness.

5          MS. GOVERNSKI:  Yep.

6          THE COURT:  And he may have to make choices about and

7  we may have to make choices about terms and other things

8  because, as you know, the more terms you have and the more

9  different types of searches you make the more expensive it is.

10         Now, if you would like to file something under seal

11 that suggests what you think are appropriate terms, right, and

12 the appropriate qualifications for an expert, you are free to do

13 that.  That might actually be helpful for Mr. Hilton --

14         MS. GOVERNSKI:  Okay.

15         THE COURT:  -- as it relates to this.

16         MR. LAVANDEIRA:  Should I wait then, Your Honor, until

17 I receive that to reach out to experts to get estimates?

18         THE COURT:  I don't know that you need to wait,

19 Mr. Hilton.  What you can do is actually after you receive it,

20 you can follow-up with your conversation on it with the experts.

21         MR. LAVANDEIRA:  Okay.

22         THE COURT:  But it may take you a few days to even

23 identify experts.  I mean, you're not a lawyer.  You don't work

24 at a firm like Ms. Governski where they probably have a list of

25 the experts that they use on speed dial.  And so, you know, big

—2:25-cv-01396-RFB-DJA—

1    litigation firms typically often do have some experts and have

2    some experience selecting them, right.  And so that's why

3    Ms. Governski, for example, is talking about understanding what

4    the qualifications are for experts in the case.

5         MS. GOVERNSKI:  One thing that I think may just be a

6    vernacular confusion, though, is I'm viewing this as a discovery

7    vendor that does collections and applies search terms.  A

8    forensic expert who, like, analyzes is slightly different.  And

9    I just want to make sure that we're on the same page and that

10   Mr. Hilton is on the same page.

11        My understanding is it's an expert to extract data from

12   his phone and apply search terms to that, like, a discovery

13   vendor.  Is that right?

14        THE COURT:  So the expert would help Mr. Hilton collect

15   the information from whatever sources are potentially pertinent.

16   I don't know because he's going to talk to the expert about what

17   they're going to do.  I've told him what is necessary to be able

18   to create the log.

19        MS. GOVERNSKI:  Okay.

20        THE COURT:  He will then talk to the expert based upon

21   what he thinks may be pertinent to be searched and reviewed

22   about how the information would be collected.  And then he may

23   talk to someone else who can also help him simply create the log

24   itself in terms of the description, some type of paralegal or

25   something to that effect.

2:25-cv-01396-RFB-DJA

1          So I can't say, again, Ms. Governski.  I don't know

2     myself, right.  And I won't know until I see the estimates

3     themselves.

4          MS. GOVERNSKI:  One thing, Your Honor, you know, when

5     we have in this case and others provided payment via third

6     parties, the way -- the information that we've provided to the

7     vendor is just the amount of data we expect, the number of

8     phones, the number of computers, the number of e-mail addresses,

9     just at a very high level.  And usually they can come up with a

10    pretty reasonable estimate for that.  So those -- that is what,

11    kind of, I meant that for us to be able to assess and provide

12    our vendor it would be helpful to know, even if he -- if you

13    determine that he shouldn't provide us with this is his specific

14    e-mail or this is his specific, but just generally there would

15    be three cloud accounts, two social media, and one cell phone.

16    Then we could go to our vendor and get a pretty reasonable

17    estimate.

18          THE COURT:  But that's -- and I agree with that,

19    Ms. Governski, but Mr. Hilton may want to get more detailed

20    estimates that would include more specific information about

21    sources of information.  And I'm not going to prevent him from

22    doing that because, I mean, it also has to be extracted in such

23    a way that he can effectively review it himself, right, and make

24    decisions about what should go in the log.

25          And so I agree with you that that information would be

—2:25-cv-01396-RFB-DJA—

1  probably all that you would need, but I may receive an estimate

2  that's much more detailed and I'm not sure that all of that

3  needs to be provided.  That's why I'm saying to you I might

4  truncate some of that, but I think provide enough that you all

5  can make a determination of whether or not the estimate's

6  reasonable.  Okay?

7          All right.  So what we're going to do moving forward

8  is, Mr. Hilton, as I've said, I'm going to order you to provide

9  a privilege log in this case, and I'm going to -- the first step

10  in that is to order you to identify three experts who can help

11  you, sort of, extract and review the information and one expert

12  who can help you come up with the log itself.  Again, that

13  person doesn't have to be a lawyer, right, because, again, we're

14  not paying for the lawyers for you, but someone who can assist

15  you, right, not providing legal advice, but can assist you just

16  creating the chart of the log.  Okay.

17          So I need for you to provide me with an estimate for

18  those two different types of sources by Monday of next week.

19  Okay?  And the more detailed the better.  And you can simply

20  e-mail those estimates to the e-mail that we provided to you.

21  And then the court will make a determination about what the next

22  step would be after that and how to provide that information to

23  respondents in this case.  Okay?

24          All right.  Is there anything else we need to do today?

25  Mr. Hilton?

———2:25-cv-01396-RFB-DJA———

1          MR. LAVANDEIRA:  No.  Thank you, Your Honor.

2          THE COURT:  Ms. Governski?

3          MS. GOVERNSKI:  Your Honor, I just wanted to close the

4   loop on questions that I didn't have complete answers for that I

5   now do.  None of the privilege -- none of the Wayfarer

6   defendants' privilege logs identify Mr. Hilton or any content

7   provider on their privilege logs.  They have not produced any

8   communications with Mr. Hilton.  So that's what I've confirmed

9   since we last spoke.

10         THE COURT:  Okay.  I will make sure that's something

11  that we take into consideration at this point.

12         Anything else, Ms. Governski?

13         MS. GOVERNSKI:  No.  Thank you, Your Honor, for all

14  your time.

15         THE COURT:  All right.  Thank you all for your time.

16  We will be adjourned.  I'm going to stay on the bench for a few

17  minutes.  Thank you.

18         (Whereupon the proceedings concluded at 3:35 p.m.)

19

20

21

22

23

24

25

2:25-cv-01396-RFB-DJA

1                          --oOo--

2              COURT REPORTER'S CERTIFICATE

3

4       I, PATRICIA L. GANCI, Official Court Reporter, United

5  States District Court, District of Nevada, Las Vegas, Nevada,

6  certify that the foregoing is a correct transcript from the

7  record of proceedings in the above-entitled matter.

8

9  Date:  September 20, 2025.

10                              /s/ **Patricia L. Ganci**

11                              Patricia L. Ganci, RMR, CRR

12

13

14

15

16

17

18

19

20

21

22

23

24

25